Jeffrey N. Pomerantz (CA Bar No. 143717)
Ellen M. Bender (CA Bar No. 116987)
Shirley S. Cho (CA Bar No. 192616)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
Email: jpomerantz@pszjlaw.com
        ebender@pszjlaw.com
        scho@pszjlaw.com

[Proposed] Counsel for the Official Committee of
Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT
### Southern District of California

| In re: | Case No.: 10-14198 MM |
|---|---|
| ISE CORPORATION, | Chapter 11 |
| Debtor. | **DECLARATION IN SUPPORT OF EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR HEARING ON MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AUTHORITY TO PURSUE LITIGATION REGARDING UPSTREAMED PAYMENTS TO PARENT ON BEHALF OF DEBTOR** |
| | [No Hearing Required] |

I, Shirley S. Cho, declare as follows:

1.      I am an attorney admitted to practice law in the State of California and before this Court and am an attorney at Pachulski Stang Ziehl & Jones LLP, proposed counsel for the Official Unsecured Creditors Committee (the "Committee")  I submit this declaration in support of the Committee's Ex Parte Application for Order Shortening Time for Hearing on Motion of Official Committee of Unsecured Creditors for Authority to Pursue Litigation Regarding Upstreamed Payment by Debtor to Parent on Behalf of Debtor.[1]

2.      I have personal knowledge of the facts set forth herein and if called upon as a witness, I could and would competently testify as to all of the matters stated therein.

---

[1] Defined terms shall have the meaning ascribed to them in the underlying Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3.      Attached hereto as **Exhibit A** is a true and correct copy of the transcript from the 341(a) meeting of creditors, which occurred in this case on September 14, 2010.

4.      I attended the section 341(a) meeting of creditors wherein the Debtor's executives testified as follows:

a.   When asked how much cash the company had on hand, the Debtor initially responded that it had $1.5 million to $1.6 million on a "consolidated" basis.  ("Q: How much cash do you have now at this point?  Roughly?  A: "I think the consolidated cash is about a million-six, a million-five." Ex. A, Tr. at 8:16-17).

b.   In response to further questioning about what the term "consolidated" meant, the Debtor testified that it meant on a consolidated basis with its parent company, which cannot be included in the cash on hand of the Debtor.  Thus, the Debtor actually only has $900,000 of cash on hand:

"Q      OKAY.  I BELIEVE YOU TESTIFIED ALSO THAT RIGHT NOW THE DEBTOR IS HOLDING A MILLION-FIVE IN CASH. YOU SAY THAT PAYROLL IS 300,000 –

A      MR. MORASH:  NO, I SAID THAT THE CONSOLIDATED IS A MILLION-FIVE.  I THINK THE DEBTOR HAS GOT ABOUT 900,000.

Q      THE DEBTOR HAS GOT ABOUT 900,000.  AND YOU SAY – YOU SAID CONSOLIDATED WAS A MILLION-FIVE?

A      MR. MORASH:  CORRECT.

. . .

Q      AND WHEN YOU SAY CONSOLIDATED, WHAT DO YOU MEAN?  CONSOLIDATED WITH WHOM?

A      MR. MORASH:  THE PARENT COMPANY.

Q      THE PARENT COMPANY.

A      MR. MORASH:  CORRECT.

Q      SO DO YOU COUNT THE PARENT MONEY AS MONEY OF THE DEBTOR?

A      MR. MORASH:  NO.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Q      OKAY.  WHY DID YOU INDICATE A MILLION-FIVE THEN ON A CONSOLIDATED BASIS.  WHAT RELEVANCE DOES THAT HAVE TO THE DEBTOR'S CASH ON HAND, WHICH WAS THE QUESTION?

A      MR. MORASH:  I MADE A MISTAKE.

Q      OKAY.  SO THE DEBTOR HAS 900,000 IN CASH, AS WE SIT HERE TODAY.

A      MR. SPRAGG:  THE DEBTOR ITSELF HAS 900,000 IN CASH, CORRECT.

MR. MORASH:  THAT'S CORRECT."

Tr. at 28:18 – 29:19.

c.   The Debtor further testified that unless it obtains additional financing in three weeks, it will run out of cash ("Q:  . . . [h]ow soon do you have to get the DIP financing.  A: Oh, we need to get the DIP financing in the next three weeks."  Tr. at 9:4-7). Tr. at 29:15 - 30:16; 31:5-16) ("Q: Ok, so the expectation is over the next three weeks, the company will not be break-even?  A:  Correct."  Tr. at 30:18-20).

d.   On the day of the Chapter 11 bankruptcy filing, the Debtor upstreamed $600,000 in cash to its non-debtor parent corporation on account of an unsecured loan that the parent made to the debtor on February 23, 2010 for $12 million.  (Tr. at 34:9-35:8)

e.   The $600,000 was upstreamed so that the parent could purportedly satisfy "filing costs" or "public company expenses" or "reportings costs" relating to the parent's obligations on the Toronto Stock Exchange.   (Tr. at 35-36)

f.   The upstreaming of the $600,000 was done to satisfy fiduciary obligations owing to the non-debtor parent company.  (Tr. at 39:3-18; 41:14-22)   In particular:

MR. SPRAGG:  I THINK TO BE CLEAR, THE DIRECTORS HAVE FIDUCIARY DUTIES TO BOTH THE DEBTOR AND TO THE PARENT COMPANY.  THEY HAPPEN TO BE THE SAME PEOPLE, SO THEY HAD TO MAKE THE DETERMINATIONS BASED ON – THERE'S TWO DIFFERENT SETS – THERE'S TWO DIFFERENT BOARDS HERE, SO WHEN DETERMINATIONS ARE MADE WITH RESPECT TO THE PUBLIC COMPANY, THERE'S A SEPARATION BETWEEN THAT AND – AND THE DEBTOR, SO WHEN ASKING, YOU KNOW, WHY THE MONEY WAS TRANSFERRED, YOU'VE GOT TO UNDERSTAND THAT

THE DIRECTORS ALSO HAVE AN OBLIGATION TO THE – TO
THE PARENT COMPANY ALSO.

Tr. at 41:13-22.  The Debtor also testified that at no time were the two board of directors represented by separate counsel in making the decision to upstream the $600,000 or any other decision.

Q    HAS THERE EVER BEEN A BOARD MEETING
WHEN THE TWO COMPANIES HAVE BEEN REPRESENTED BY
DIFFERENT COUNSEL?

A    MR. SPRAGG:  NO.

Q    SO COUNSEL REPRESENTS BOTH COMPANIES
AT THE BOARD MEETINGS?

A    MR. SPRAGG:  THAT'S CORRECT.

Tr. at 42:17-23.

5.    The Committee has made several efforts to resolve this matter without seeking the intervention of the Court, but as of the time this Application is filed, such efforts have been unsuccessful.

6.    The Committee sent a demand letter to the Debtor on September 15, 2010 demanding that the $600,000 be returned, otherwise the Committee would be seeking expedited relief for return of such funds by September 20, 2010.  Attached as **Exhibit B** is a true and correct copy of the September 15, 2010 letter, to which no formal response has ever been received.

7.    The Committee has requested that (i) the Debtor stipulate to the Committee's standing to pursue the Action, and (ii) further stipulate in writing that the parent would transfer the money to a client trust account and not dispose of the money pending Court order.  Attached as **Exhibit C** is a true and correct copy of a letter that the Committee sent to the Debtor on September 20, 2010 after the Standing Motion was filed requesting a response by 12:00 p.m. on September 22, 2010.  To date, no formal response has been received to this letter either.

8.    Despite what counsel for the Debtor argued at the Chapter 11 Status Conference before this Court on September 22, 2010, the Debtor/parent has never agreed to transfer the $600,000 to an attorney trust fund account.  At most, the Debtor/parent has stated it may be willing to do so, but that it needed approval from its board and that the money could still be spent upon

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

notice to the Committee.  Attached as **Exhibit D** is a true and correct copy of communication from Debtor's counsel on that point.

9.    On September 23, 2010, I received a further email from Debtor's counsel indicating that it could not respond until next Tuesday, September 29, 2010 after its parent holds a board meeting.  Attached as **Exhibit E** is a true and correct copy of communication from Debtor's counsel on that point.

10.    The Debtor has refused to respond to the Committee's two questions of whether the Debtor will grant the Committee standing to pursue the Action and whether the Debtor/ parent will agree to transfer the money to a client trust fund account that cannot be moved without a Court order.  *See* **Exhibit F** (email communication between Debtor's counsel and Committee's counsel).

11.    As of this date, despite the Committee's demand that is now 10 days old, the Committee still has no assurances in writing from the Debtor or the parent that the funds will not be spent or ever returned to this estate.

12.    The Debtor, through counsel, has informed me that the parent, ISE Ltd., may take evasive action in response to the Committee's demands by filing ISE Ltd. for bankruptcy.  *See* Ex. F.

13.    Attached as **Exhibit G** hereto is a public press release issued by ISE Ltd. indicating that it has no intention to comply with public reporting requirements.  The Debtor, through counsel, has informed me that the bulk of the $600,000 was upstreamed to pay for D & O insurance tail coverage and not public reporting costs of the parent.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 24th day of September, 2010, at Los Angeles, California.


*/s/ Shirley S. Cho*
Shirley S. Cho

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

1          UNITED STATES BANKRUPTCY COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3        OFFICE OF THE UNITED STATES TRUSTEE

4

5   IN THE MATTER OF:

6   I.S.E. CORPORATION,              CASE NO. 10-14198-MM11

7

8            DEBTOR.

9

10

11

12

13

14          341(A) FIRST MEETING OF CREDITORS

15

16

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19            SAN DIEGO, CALIFORNIA

20          TUESDAY, SEPTEMBER 14, 2010

21

22

23   OFFICE OF THE U.S. TRUSTEE    FEDERAL COURT REPORTERS
24   402 WEST BROADWAY,            BY:  DIANE BERGER
       SUITE 600                   POST OFFICE BOX 60583
25   SAN DIEGO, CALIFORNIA 92101   SAN DIEGO, CALIFORNIA 92166
                                   TELEPHONE:  (619) 223-6082

1   SAN DIEGO, CALIFORNIA, TUESDAY, SEPTEMBER 14, 2010, 1:55 P.M.

2                              -- oOo --

3

4           THE TRUSTEE:  GOOD AFTERNOON.  MY NAME IS LORRAINE

5   GREEN.  I AM A BANKRUPTCY ANALYST WITH THE OFFICE OF THE UNITED

6   STATES TRUSTEE.  WE'RE HERE FOR A FIRST MEETING OF CREDITORS IN

7   THE CASE OF I.S.E. CORPORATION, CASE NUMBER 10-14198-MM11.

8           TODAY IS TUESDAY, SEPTEMBER 14TH, 2010.  THE TIME IS

9   APPROXIMATELY 1:55.

10          LET THE RECORD SHOW THAT WE DO HAVE DEBTOR'S COUNSEL

11  AND DEBTOR'S PRINCIPALS HERE, AS WELL AS SEVERAL CREDITORS.

12          COULD I HAVE THE APPEARANCES OF DEBTOR AND DEBTOR'S

13  COUNSEL, PLEASE?

14          MR. WINTHROP:  MARK WINTHROP, WINTHROP, COUCHOT

15  PROFESSIONAL CORPORATION, COUNSEL FOR THE DEBTOR AND DEBTOR-IN-

16  POSSESSION.

17          MR. SANDER:  RICHARD SANDER, C.E.O. AND PRESIDENT.

18          MR. SPRAGUE:  JUSTIN SPRAGG, VICE PRESIDENT,  GENERAL

19  COUNSEL, AND CHIEF RESTRUCTURING OFFICER.

20          MR. MORASH:  DAVE MORASH, C.F.O.

21          MS. GREEN:  OKAY.  AND ARE ALL THREE OF YOU GOING TO

22  BE TESTIFYING HERE TODAY?

23          MR. MORASH:  SURE.

24          MS. GREEN:  CAN YOU PLEASE ALL - PLEASE ALL THREE OF

25  YOU PLEASE RAISE YOUR RIGHT HANDS?

1          (WITNESSES SWORN.)

2                      RICHARD J. SANDER,

3                       DAVID L. MORASH,

4                      AND JUSTIN SPRAGG,

5          DEBTOR REPRESENTATIVES HEREIN, HAVING BEEN

6          PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS:

7                          EXAMINATION

8   BY MS. GREEN:

9          Q     COULD YOU ALL – ALL THREE OF YOU PLEASE STATE

10  YOUR NAME FOR THE RECORD – YOU DID STATE YOUR NAME FOR THE

11  RECORD.

12         MR. WINTHROP:  THEY DID.

13         MS. GREEN:  SORRY ABOUT THAT.

14  BY MS. GREEN:

15         Q    DO YOU REALIZE THAT YOU ARE TESTIFYING UNDER

16  PENALTY OF PERJURY TODAY?  OKAY?

17         A    MR. SANDER:  YES.

18              MR. MORASH:  YES.

19              MR. SPRAGG:  YES.

20         Q    OKAY?

21         LET'S JUST – LET'S JUST – WHO'S GOING TO DO – WHO DO

22  YOU THINK IS GOING TO BE THE MAIN PERSON TO OFFER TESTIMONY

23  TODAY?

24         MR. SANDER:  JUSTIN SPRAGG.

25  BY MS. GREEN:

1          Q     OKAY.

2          OKAY, MR. SPRAGG, DO YOU WANT TO TELL ME WHO OWNS

3   THIS CORPORATION?  WHO OWNS THE DEBTOR, I.S.E. CORPORATION?

4          A     MR. SPRAGG:  IT'S I.S.E., LIMITED.  IT'S THE

5   PARENT COMPANY.

6          Q     I.S.E., LIMITED?

7          A     MR. SPRAGG:  THAT'S CORRECT.

8          Q     AND WHO OWNS I.S.E., LIMITED?

9          A     MR. SPRAGG:  IT'S - IT WAS FORMERLY A PUBLICLY-

10  TRADED COMPANY, SO THERE IS A FEW HUNDRED SHAREHOLDERS.

11         Q     WHO'S THE MAJORITY SHAREHOLDER?

12         A     MR. SPRAGG:  THERE IS NO MAJORITY SHAREHOLDER.

13  THERE'S - THERE ARE A NUMBER OF LARGE SHAREHOLDERS WHO - WHO

14  INCLUDE ROCKPORT (PHONETIC) CAPITAL, SIEMENS (PHONETIC) VENTURE

15  CAPITAL, N.G.P. PARTNERS ARE THE THREE MAIN LARGE SHAREHOLDERS.

16         Q     YOU SAID ROCKPORT CAPITAL, N.P.G. PARTNERS, AND

17  WHAT WAS THE SECOND ONE?

18         A     MR. SANDER:  SIEMEN -

19               MR. MORASH:  - SIEMEN -

20               MR. SPRAGG:  - SIEMENS VENTURE CAPITAL.

21         Q     OKAY.  CAN YOU TELL US WHY YOU FILED FOR

22  BANKRUTPCY?

23         A     MR. SPRAGG:  THE - THE COMPANY WAS UNABLE TO

24  SECURE ADDITIONAL FINANCING IN THE MAY AND JUNE TIME FRAME,

25  SUCH THAT WE - WE RAN LOW ON - ON CASH, HAD A LIQUIDITY

1    PROBLEM, AND BECAUSE OF THAT HAD TO FILE CHAPTER 11.

2            Q    OKAY.  AND SO BASICALLY, AT THE TIME OF FILING,

3    HOW MUCH – DID YOU HAVE A – HOW MUCH CASH DID YOU – HOW MANY –

4    I GUESS – WHAT TIME PERIOD COULD YOU PAY YOUR BILLS, YOUR ON-

5    GOING BILLS?  SIX MONTHS?  A YEAR?  OR HOW LONG DID YOU HAVE AS

6    FAR AS RESERVES, AS FAR AS YOUR EXPENSES GO, AT THE TIME OF

7    FILING?

8            A    MR. SPRAGG:  AT THE TIME OF FILING, REFER TO

9    DAVE ON THAT ONE.  HE FILED ON AUGUST 10TH, AND IT'S –

10               MR. MORASH:  WE HAD PROBABLY A COUPLE MONTHS'

11   WORTH.

12           Q    ABOUT TWO MONTHS?

13           A    MR. SPRAGG:  I SHOULD –

14           MR. SPRAGG:  – I – YOU KNOW, I – THAT IS IF WE DIDN'T

15   MAKE ANY CHANGES IN THE BUSINESS I SUSPECT. –

16               MR. MORASH:  RIGHT.

17               MR. SPRAGG:  – IS THAT RIGHT?

18           Q    OKAY.

19           A    MR. SPRAGG:  THERE WAS A POSSIBILITY THAT THE

20   BUSINESS COULD BE – EXPENSES WERE CUT FURTHER THAT WOULD EXTEND

21   THE TIME THE COMPANY COULD CONTINUE TO OPERATE AND DO BUSINESS.

22           Q    OKAY.  AND WERE ANY – ANY COST-CUTTING MEASURES

23   DONE PRIOR TO THE FILING?

24           A    MR. MORASH:  WE – I'M SORRY.

25               MR. SPRAGG:  HIM, I GUESS.

5

1          Q      WHICHEVER.

2          A      MR. SPRAGG:  NO, I - I THINK WHERE HE WAS GOING

3    IS HE HAD A MAJOR REDUCTION IN FORCE THAT WE ORIGINALLY - IN

4    FEBRUARY WE HAD ABOUT 130 EMPLOYEES, APPROXIMATELY.  TODAY, WE

5    HAVE ABOUT 75 SO THAT DURING THE TIME PERIOD, WE - A

6    SIGNIFICANT REDUCTION IN FORCE WAS THE MAIN - THE MAJOR COST-

7    CUTTING EFFORT.

8          Q      OKAY.  AND HOW MUCH DID THAT SAVE PER - WHAT -

9    WHAT WOULD THAT SAVE ON A -

10         A      MR. SPRAGG:  YEAH.

11         Q      - A MONTHLY BASIS, ROUGHLY?

12         A      MR. SPRAGG:  I'LL REFER TO DAVID.

13         Q      OR IN GEN- - IN TOTAL, SUPPOSE?

14         A      MR. MORASH:  IT'S PROBABLY PRETTY CLOSE TO

15   200,000 A PAY PERIOD, EVERY OTHER WEEK.

16         Q      OKAY.

17                AND WHAT'S OUR PLAN - OUR EXIT STRATEGY HERE?  HOW DO

18   WE PLAN -

19         A      MR. SPRAGG:  WELL, THE -

20         Q      - TO GET OUT?

21         A      MR. SPRAGG:  - THE CURRENT PLAN IS FOR US TO

22   SECURE DIP FINANCING TO ENABLE US TO GET THROUGH A 363 SALE

23   PROCESS.  WE HAVE ENGAGED S.S.G. AND CARILLO (PHONETIC) CAPITAL

24   PARTNERS AS OUR BANKER TO HELP US THROUGH THE 363 SALE PROCESS.

25   WE'VE ALSO ENGAGED A BANKER CALLED SEABISCUIT (PHONETIC), WHO

1  IS ASSISTING US WITH THE DIP FINANCING PROCESS, AND

2  SEABISCUIT'S BEEN WORKING WITH US SINCE JULY.  DAVE IDENTIFIED

3  A PARTICULAR LENDER THAT WE'RE WORKING WITH NOW, AND WE'RE

4  TRYING TO CLOSE A TRANSACTION WITH.

5          Q    OKAY.  AND WE DON'T HAVE ANYTHING FILED ON THAT?

6          MR. WINTHROP:  JUST - YEAH.  JUST FOR CLARITY -

7          MS. GREEN:  YES.

8          MR. WINTHROP:  - WHAT - WHAT - WHILE - WHILE THE

9  COMPANY HAS DETERMINED TO ENGAGE THESE - THESE ENTITIES, WE ARE

10 PREPARING THE APPLICATIONS FOR THEIR FORMAL ENGAGEMENT, WHICH

11 SHOULD BE FILED VERY SHORTLY.

12         MR. SPRAGG:  THAT'S FOR CLARIFYING.  WE - WE DID SIGN

13 AN ENGAGEMENT LETTER WITH S.S.G., BUT IT'S SUBJECT TO - TO

14 COURT APPROVAL.

15         MS. GREEN:  OKAY.

16 BY MS. GREEN:

17         Q    AND THE D.I.P. FINANCING.  SO, ARE - SO, HAS

18 THAT BEEN FINALIZED AT THIS POINT?  OR -

19         A    MR. SPRAGG:  NO, WE ARE - WE ARE - WE'VE

20 COMPLETED MOST OF THE DUE DILIGENCE AT THIS STAGE.  WE ARE NOW

21 IN THE PROCESS OF NEGOTIATING A DEFINITIVE DOCUMENTATION.

22 TIMING IS STILL UNCERTAIN AS TO WHEN IT'S GOING CLOSE.

23         Q    OKAY.  AND HOW ABOUT THE SALE OF THE BUSINESS?

24 DO YOU HAVE SOMEONE IN MIND FOR THAT?  IS THERE -

25         A    MR. SPRAGG:  WE'VE BEEN SPEAKING WITH A NUMBER

1    OF INTERESTED PARTIES OVER THE PAST FEW MONTHS, SO THERE ARE –

2    THERE ARE – THERE ARE QUITE A FEW.  THERE'S NO ONE PARTICULAR

3    PURCHASER THAT WE HAVE IN MIND TODAY, BUT THERE ARE A NUMBER

4    THAT HAVE SHOWN A LOT OF INTEREST.

5         Q    HOW MANY WOULD YOU SAY HAVE SHOWN INTEREST?

6         A    MR. SPRAGG:  WELL, AGAIN, JUST TO REITERATE,

7    WE'VE – WE JUST, YOU KNOW, ENGAGED S.S.G. TO REALLY GO OUT AND

8    DO A BLANKET SEARCH, BUT JUST BASED ON MANAGEMENT'S EFFORTS,

9    WE'VE PROBABLY SPOKEN TO BETWEEN TEN AND TWENTY INTERESTED

10   PARTIES.

11        Q    OKAY.  AND – LET ME GET THIS OUT HERE.

12        I WANTED TO TALK TO YOU ABOUT YOUR – WELL, LET'S –

13   LET'S TALK ABOUT YOUR SCHEDULE B.  AT THE TIME OF FILING, YOU

14   HAD ABOUT $1.8 MILLION.  HOW MUCH CASH DO YOU HAVE NOW AT THIS

15   POINT? ROUGHLY?

16        A    MR. MORASH:  I THINK THE CONSOLIDATED CASH IS

17   ABOUT A MILLION-SIX, A MILLION-FIVE.

18        Q    AND WHAT ARE YOUR MONTHLY – WHAT'S YOUR MONTHLY

19   – I GUESS, YOU DON'T – DO YOU BREAK EVEN OR IS THERE A MONTHLY

20   NET LOSS ON –

21        A    MR. MORASH:  THERE'S A MONTHLY NET LOSS.

22        Q    OF WHAT?  OF APPROXIMATELY HOW MUCH PER MONTH?

23        A    MR. MORASH:  IT'S – IT VARIES BECAUSE RIGHT NOW

24   WHAT WE HAVE BEEN DOING IS SELLING INVENTORY, AND SO I GUESS I

25   WOULD SAY RIGHT NOW WE'RE PRETTY CLOSE TO BREAK EVEN WITH THOSE

1  INVENTORY SALES.  THAT'S WHY THE CASH AS OF –

2          Q    SO ESSENTIALLY THEN BASICALLY WHAT – WHATEVER

3  CASH YOU HAVE RIGHT NOW – YOU HAVE THE 1.5 – HOW LONG WILL THAT

4  LAST YOU BEFORE – I MEAN, IN OTHER WORDS, HOW SOON DO YOU HAVE

5  TO GET THE DIP FINANCING?

6          A    MR. MORASH:  OH, WE NEED TO GET THE DIP

7  FINANCING IN THE NEXT THREE WEEKS.

8          Q    OKAY.  SO YOU HAVE ENOUGH CASH TO MEET YOUR

9  EXPENSES FOR THE NEXT THREE WEEKS?

10          A    MR. MORASH:  CORRECT.

11          Q    SO YOU'RE SAYING BETWEEN THE TIME, ROUGHLY –

12  BETWEEN THE TIME OF FILING ON AUGUST 10TH, 2010, AND OUR

13  CURRENT TIME, WE'VE GONE THROUGH ABOUT $3 MILLION OR ONE POINT

14  – NO, $300,000?

15          A    MR. MORASH:  YEAH, SOMEWHERE AROUND THERE.

16          Q    ABOUT THAT?  OKAY.

17          AND LET ME ASK YOU THIS:  AT THE TIME OF FILING, YOU

18  HAD ABOUT 4.6 MILLION IN ACCOUNTS RECEIVABLE.  IS THAT CORRECT?

19          A    MR. MORASH:  CORRECT.

20          Q    OKAY.  I'M JUST ROUNDING UP A LITTLE BIT.

21          A    MR. MORASH:  YEAH.

22          Q    IS THAT COLLECTIBLE?

23          A    MR. MORASH:  THERE ARE SOME DISPUTES RELATIVE TO

24  THE AMOUNTS.

25          Q    OKAY.  SO HOW MUCH WOULD YOU ESTIMATE IS

1    COLLECTIBLE?

2            A    MR. MORASH:  WELL, I MEAN, CONCEPTUALLY, IT'S

3    ALL COLLECTIBLE.  THE QUESTION IS WHETHER OR NOT THERE'LL BE

4    OFF-SETS AGAINST IT.

5            Q    OKAY.  WELL, IF WE HAD TO TAKE IT, HOW MUCH

6    WOULD YOU SAY IS IN DISPUTE?

7            A    MR. MORASH:  PROBABLY FOUR MILLION OF IT.

8            Q    OKAY.  SO WE HAVE WHAT, ABOUT, SAY 500 -

9    $600,000 MAYBE THAT'S READILY COLLECTIBLE?

10           A    MR. MORASH: COLLECTIBLE.

11           Q    HOW MUCH HAVE YOU COLLECTED POST-PETITION?

12           A    MR. MORASH:  WE HAVE PROBABLY COLLECTED, OH,

13   FOUR OR 500,000.  BUT THAT - THERE'S BEEN ADDITIONS -

14           Q    THAT'S WHAT - THAT WAS - THAT WAS MY NEXT

15   QUESTION.

16           A    MR. MORASH:  THAT'S THE -

17           Q    HOW MUCH OF ADDITIONS TO - TO ACCOUNTS

18   RECEIVABLE HAVE YOU HAD, ROUGHLY?

19           A    MR. MORASH:  PROBABLY MOST OF THAT HAS BEEN.

20           Q    SO IN AND OUT.  SO WE STILL HAVE ABOUT 500,000

21   WOULD YOU - WHAT'S YOUR CURRENT BALANCE IN ACCOUNTS RECEIVABLE

22   THEN?  IS IT STILL ABOUT THE SAME AT THE TIME OF FILING?

23           A    MR. MORASH:  ACTUALLY, IT'S GONE UP A COUPLE OF

24   MILLION BECAUSE WE HAVE MADE ADDITIONAL INVOICES TO OUR MAJOR

25   CUSTOMER.

1          Q     OKAY.  SO WHAT WOULD YOU SAY, ROUGHLY, IS IT

2     THEN?  IT'S – IT'S ABOUT –

3          A     MR. MORASH:  IT'S OVER – IT'S OVER SEVEN MILLION

4     NOW.

5          Q     OKAY.  SO HOW MUCH HAVE YOU BOOKED ON YOUR MAJOR

6     CUSTOMER ADDITION – ADDED TO ACCOUNTS RECEIVABLE?

7          A     MR. MORASH:  THE WHOLE THING.  THE – THE –

8          Q     THE WHOLE –

9          A     MR. MORASH:  – TWO MILLION.

10         Q     OKAY.  ABOUT TWO MILLION.  AND WHEN WILL THAT BE

11    PAID?

12         A     MR. MORASH:  IT'S IN DISPUTE.

13         Q     OH, IT'S IN DISPUTE.

14         SO IT'S NOT NECESSARILY READILY COLLECTIBLE.

15         A     MR. MORASH:  CORRECT.

16         Q     OKAY.  SO ESSENTIALLY, ARE WE GOING TO COLLECT

17    ANYTHING – WE HAVEN'T COLLECTED ANYTHING POST-PETITION?  YOU

18    COLLECTED 400 TO $500,000 –

19         A     MR. MORASH:  UH-HUH.

20         Q     – ROUGHLY.  OKAY.  AND THERE'S STILL ANOTHER 500

21    MAYBE THAT YOU COULD COLLECT ON?

22         A     MR. MORASH:  YEAH, PROBABLY.

23         Q     IT'S NOT IN DISPUTE?

24         A     MR. MORASH:  CORRECT.

25         Q     OKAY.

1          LET'S TALK ABOUT YOUR INVENTORY.  ACCORDING TO

2  SCHEDULE B, IT WAS ABOUT 4.8 MILLION.  HOW DID YOU VALUE THAT

3  INVENTORY?

4          A    MR. MORASH:  COST.

5          Q    COST.  AND YOU SAID YOU'VE BEEN SELLING

6  INVENTORY.  HOW MUCH HAVE YOU SOLD SINCE THE FILING?

7          A    MR. MORASH:  OH, 300,000.

8          MR. SPRAGG:  I THINK FOR CLARITY TALKING ABOUT

9  ACCOUNTS RECEIVABLE, WE ARE EXPECTING A PRETTY MAJOR ORDER IN

10 THE NEXT TWO MONTHS IN THE - IN THE RANGE OF FOUR - $4 MILLION

11 COMING IN.  THAT HASN'T - WE HAVEN'T GOTTEN THE ORDER YET, BUT

12 WE EXPECT TO HAVE IT IN THE NEXT, YOU KNOW, SIX WEEKS AT THE -

13          Q    SO WOULD THAT CHANGE YOUR NEED FOR DIP

14 FINANCING?

15          A    MR. MORASH:  THE DIP FINANCING REQUIREMENT IS

16 NOW -

17          Q    - AND THIS WOULD BE SOMETIME IN THE FUTURE?

18          UNIDENTIFIED SPEAKER:  THAT'S CORRECT.

19          MR. WINTHROP:  YEAH.  I THINK THE TESTIMONY HAS BEEN

20 WE NEED THE DIP IN APPROXIMATELY THREE WEEKS, AND THIS ORDER IS

21 NOT GOING TO COME IN -

22          MS. GREEN:  - COME IN UNTIL -

23          MR. SPRAGG:  - SIX TO EIGHT WEEKS.

24 BY MS. GREEN:

25          Q    AND TYPICALLY, HOW QUICKLY DO YOU COLLECT ON

1    ORDERS THAT YOU BOOK?

2              A    MR. MORASH:  THIS IS KIND OF AN ATYPICAL ORDER.

3              Q    OKAY.

4              A    MR. MORASH:  SO IT'S FOR THE CITY OF LONDON, AND

5    - AND WE DELIVERED FIVE HYDROGEN VEHICLES TO THEM, AND THERE IS

6    A - A STRONG LIKELIHOOD THAT THEY'LL GIVE US AN ORDER FOR THREE

7    ADDITIONAL.

8              Q    OKAY.

9              A    MR. MORASH:  AND THE LIKELIHOOD IS THAT THE - IS

10   THAT WE'LL HAVE A FAIR AMOUNT OF UP-FRONT CASH OUT OF THAT

11   TRANSACTION.  BUT THAT'S IN NEGOTIATIONS.

12             Q    OKAY.

13             A    MR. SPRAGG:  YEAH.  WE'RE STILL NEGOTIATING THE

14   AMOUNT OF - THE EXACT AMOUNT OF MONEY WE'RE GOING TO GET AS

15   PART OF THE INITIAL ORDER.

16             Q    SO THAT WOULD BE UP FRONT -

17             A    MR. SPRAGG:  YES.

18             Q    - AS SOON AS THE DEAL IS FINALIZED.

19             A    MR. SPRAGG:  YES.  WE WOULD NEVER GO CASH-FLOW

20   NEGATIVE ON THAT DEAL.

21             Q    OKAY.  ANY IDEA WHEN THAT MIGHT BE RESOLVED?

22             A    MR. SPRAGG:  WE EXPECT TO HAVE A LOT OF CLARITY

23   IN THE NEXT FEW WEEKS, THE NEXT TWO TO THREE WEEKS AS TO THE

24   AMOUNT OF THE INITIAL PAYMENT, AND WE EXPECT TO GET THE ORDER -

25   ASSUMING WE GET THE FINANCING IN PLACE TO DEMONSTRATE THAT

13

1   WE'RE FINANCIALLY VIABLE – THEY'RE – THEY'RE TIED TO EACH OTHER

2   – WE SHOULD GET THE ORDER BY THE END OF OCTOBER.

3              I SPOKE WITH THE – THE CUSTOMER THIS MORNING.

4        Q    OKAY.  YOU HAVE SEVERAL PATENTS LISTED IN

5   SCHEDULE B THAT ARE NOT VALUED.  ARE THOSE SALEABLE?

6        A    MR. SPRAGG:  WE BELIEVE SO.

7        Q    OKAY.  AND – BUT YOU HAVE NO – EVEN A RANGE OF

8   WHAT THEY MIGHT BE WORTH?

9        A    MR. SPRAGG:  A LOT OF THE PATENTS ARE IN A VERY

10  NEW AND EXCITING FIELD CALLED ENERGY STORAGE, AND WE THINK THAT

11  THEY COULD BE WORTH UPWARDS OF, YOU KNOW, TEN-PLUS MILLION, BUT

12  WE'VE – WE'VE NEVER HAD AN EVALUATION DONE, SO WE COULD – THERE

13  ARE DIFFERENT WAYS OF TRYING TO VALUE PATENTS, YOU KNOW.  LOOK

14  AT IT AS HOW MUCH YOU PAID TO HAVE THEM FILED.  THAT SORT OF

15  THING DOESN'T REALLY GIVE YOU THE VALUE.  SO WE – WE THINK

16  THEY'RE QUITE VALUABLE.  WE – WE'VE DONE – ABOUT THIRTY-FIVE

17  PATENTS HAVE BEEN ISSUE.  ANOTHER APPROXIMATELY THIRTY-FIVE ARE

18  IN PROSECUTION.  TO PUT A VALUE ON THAT IS GOING TO BE

19  DIFFICULT TODAY, THOUGH WE THINK THAT THERE IS GOING TO BE A

20  DEMAND IF THERE IS A BIDDING PROCESS.

21             MR. SANDER:  AND – AND I WOULD SAY THAT THE

22  VALUE OF THOSE PATENTS ARE A LOT MORE IF THE COMPANY IS IN

23  OPERATION, AND THEY'RE – IF THE COMPANY IS NOT IN OPERATION,

24  THEN THE VALUE IS QUITE, QUITE DIMINISHED.

25             MR. SPRAGG:  YES.

1          Q    SO IS –

2          A    MR. SPRAGG:  SO THERE IS A REALLY WIDE RANGE

3    RIGHT NOW.  IT'S GOING TO DEPEND ON WHAT THE WILL- –

4          Q    OKAY.

5          A    MR. SPRAGG:  – WHAT THE MARKET'S WILLING TO PAY

6    FOR IT –

7          Q    OKAY.

8          A    MR. SPRAGG:  – SO WE'RE JUST AT THIS POINT

9    SPECULATING AS TO THE VALUE.  WE HAVEN'T EVEN DONE A – AN

10   APPRAISAL.

11         Q    WHAT WAS THE COST – WHAT'S – WHAT'S YOUR R AND D

12   COSTS ON THAT?  HAVE YOU CAPITALIZED R AND D COSTS ON THOSE?

13         A    MR. SPRAGG:  DO YOU KNOW ABOUT THE –

14         Q    ROUGHLY.

15         A    MR. SPRAGG:  – NUMBERS ON THAT, DAVE?

16              MR. MORASH:  IT'S AROUND – OH, THE R AND D

17   COSTS, CAPITALIZED.

18         Q    CAPITALIZED.

19         A    MR. MORASH:  WE HAVEN'T CAPITALIZED THEM, NO.

20         Q    DO YOU HAVE AN ESTIMATE AS TO WHAT YOU THOUGHT

21   YOU'D SPENT –

22         A    MR. MORASH:  WE'VE –

23         Q    – SO FAR TO DEVELOP THOSE ?

24         A    MR. MORASH:  – WE HAVE PROBABLY SPENT IN THE

25   NEIGHBORHOOD OF –

15

1              MR. SPRAGG:   IT IS NOT  RELATED TO THE PATENTS.

2              MR. MORASH:   IN OTHER WORDS, PROBABLY TEN TO

3   $15 MILLION IN R AND D -

4         Q    OKAY.

5         A    MR. MORASH:  - WHICH HAS BEEN EXPENSED OVER THE

6   PERIOD.

7         Q    RIGHT.  OKAY.

8         SO THEN AS FAR AS WHAT - IF A POTENTIAL BUYER OF THE

9   COMPANY, WHAT WOULD YOU SAY IS THE BIGGEST VALUE ITEM?  WHAT

10  WOULD YOU SAY?  I MEAN, AS FAR AS LIKE, WOULD IT BE THE

11  TECHNOLOGY, THE CUSTOMER LIST, YOU KNOW, YOUR -

12        A    MR. MORASH:  IT'S -

13        Q    - CONTRACTS?

14        A    MR. MORASH:  - IT'S TWO SEPARATE BUSINESSES.

15        Q    OKAY.

16        A    MR. MORASH:  ONE IS THE INTEGRATION BUSINESS,

17  WHERE WE HAVE ROUGHLY 300-PLUS UNITS OUT ON THE ROAD, INCLUDING

18  SAN DIEGO.

19        Q    OKAY.

20        A    MR. MORASH:  AND - AND SO THAT INTEGRATION

21  BUSINESS HAS A VALUE, AS AN ON-GOING CONCERN, PARTICULARLY AT

22  THIS STAGE; AND THEN THERE'S ENERGY STORAGE, WHICH IS WHERE A

23  LOT OF THE PATENTS LAY AND WHERE WE BELIEVE, GOING FORWARD,

24  THERE'S A SUBSTANTIAL AMOUNT OF VALUE IN TERMS OF THE ENERGY

25  STORAGE PROCESS, GIVEN THE BILLIONS OF DOLLARS THAT THE FEDERAL

1  - THE FEDERAL GOVERNMENT IS POURING INTO ENERGY STORAGE.

2          Q    AT THIS POINT IN TIME, THE - DOES THE ENERGY

3  STORAGE BUSINESS GENERATE ANY REVENUES?

4          A    MR. SPRAGG:  VERY LITTLE.

5               MR. MORASH:  THERE'S A SMALL AMOUNT OF REVENUES.

6          Q    I AM HAVING TROUBLE HERE WITH MY PEN.

7               OKAY, NOW, LET ME BACK UP HERE A LITTLE BIT AND LET'S

8  TALK ABOUT YOUR POST-PETITION OPERATIONS.  WE TALKED ABOUT

9  THAT.  YOU SAID THAT YOU WERE BASICALLY ON A BREAK-EVEN NOW.

10              ARE YOU CURRENT IN YOUR POST-PETITION OBLIGATIONS?

11         A    MR. MORASH:  YES.

12         Q    HAS THIS -

13         A    MR. MORASH:  - PAYROLL.  THAT WAS -

14         Q    I'M SORRY.  PARDON?

15         A    MR. MORASH:  SORRY.  NO COMMENT.

16         Q    OKAY.  WELL, WE'RE GETTING - WE'RE GETTING TO

17  THAT.

18              AS FAR AS YOUR POST-PETITION OBLIGATIONS, HAVE YOU

19  BEEN ABLE TO PAY YOUR BILLS AS THEY HAVE BECOME DUE, SO YOU'RE

20  CURRENT ON YOUR RENTS, YOUR PAYROLL, PAYROLL TAXES?

21         A    MR. MORASH:  YES.

22         Q    OKAY.  HAS THIS COMPANY EVER BEEN PROFITABLE?

23         A    MR. MORASH:  THAT'S QUESTIONABLE.

24         Q    OKAY.

25         A    MR. MORASH:  SO THERE ARE - THERE WAS A YEAR IN

1   WHICH IT WAS REPORTED TO BE PROFITABLE.

2           Q    WHICH YEAR WAS THAT?

3           A    MR. MORASH:  THAT WAS '95.

4           Q    AND WAS IT THE SAME DEBTOR ENTITY AT THAT POINT

5   OR WAS THAT YOUR PRE-PUBLIC DAYS?

6           MR. SPRAGG:  THE - THE COMPANY IS NOT PUBLIC.

7           MS. GREEN:  NO, IT WAS -

8           MR. SPRAGG:  THE PARENT -

9           MS. GREEN:  - I MEAN YOUR PRE-ACQUISITION DAYS.

10          MR. MORASH:  YEAH.  THAT WAS PRE-.

11  BY MS. GREEN:

12          Q    AND - BUT SINCE IT'S BEEN ACQUIRED BY THIS

13  DEBTOR, I MEAN, IT - IT - SINCE THIS DEBTOR IS -

14          A    MR. MORASH:  NO, IT'S - IT'S THE -

15          MR. MORASH:  IT WASN'T ACQUIRED.  IT'S - SO WE SET UP

16  A - WE SET UP A PARENT.  IN ORDER TO GO PUBLIC, WE SET UP A

17  PARENT COMPANY.

18          MS. GREEN:  OKAY.

19          MR. MORASH:  SO THERE WAS NO ACQUISITION.  ALL I'M

20  SAYING IS THAT THE - THE NUMBERS THAT WERE GIVEN IN - IN 2005

21  SHOWED A PROFIT.  I DON'T BELIEVE THAT WE ACTUALLY MADE A

22  PROFIT.

23          MS. GREEN:  OKAY.

24  BY MS. GREEN:

25          Q    IT WAS A PAPER PROFIT.

1          A     MR. SPRAGG:  DID – DID YOU WRITE DOWN '95 OR

2     '05?

3          Q     I WROTE DOWN '95 –

4          A     MR. SPRAGG:  I'M SORRY.

5          Q     – BECAUSE YOU SAID '95.

6          A     MR. SPRAGG:  I'M SORRY.  NINETY-FIVE.

7                MR. MORASH:  IT'S 2005.

8          Q     IT'S 2005.

9          A     MR. MORASH:  MY – MY –

10         Q     I JUST ERASED IT BECAUSE I –

11         A     MR. MORASH:  YEAH, NO, 2005.

12               MR. SPRAGG:  LIFE IS RACING BY.

13         Q     IT IS RACING BY.  BEFORE YOU KNOW IT, WE'LL BE

14    IN THE NEXT CENTURY.

15         A     MR. SPRAGG:  YEAH.

16         Q     SO, ANYWAY –

17         A     MR. MORASH:  NO –

18         Q     – HAS – HAVE INS-

19               (LAUGHTER.)

20    BY MS. GREEN:

21         Q     – HAVE ANY INSIDERS BEEN PAID POST-PETITION?

22    HAS ANYONE RECEIVED – ANY OFFICERS, DIRECTORS, INSIDERS OF ANY

23    SORT RECEIVED ANY COMPENSATION SINCE THE FILING OF THE

24    BANKRUPTCY?

25         A     MR. MORASH:  NO.

1              MR. SPRAGG:  NO.

2         Q    OKAY.  WHY DON'T YOU TELL ME:  I KNOW THAT THERE

3    IS A PENDING MOTION FOR INSIDER COMPENSATION.  WHY DON'T WE GET

4    - GET - CAN YOU GIVE ME A STATUS OF THAT AT THIS POINT?  WHERE

5    WE ARE WITH THAT?  MY UNDERSTANDING WAS - IS THAT YOU HAVE -

6    YOU TALKED TO THE CREDITORS' COMMITTEE ABOUT THAT, OR CAN YOU -

7    WHY DON'T YOU JUST TELL EVERYONE -

8              MR. WINTHROP:  WELL, WE FILED A MOTION -

9              MS. GREEN:  RIGHT.

10             MR. WINTHROP:  ON - ON THE 2ND OF SEPTEMBER, AS AN

11   EMERGENCY MOTION TO - FOR THE ALLOWANCE OF INSIDER COMP.  WE

12   ARE AWAITING, YOU KNOW, WORD FROM YOUR OFFICE, AND WE'VE

13   DISCUSSED THIS WITH THE CREDITORS'S COMMITTEE.  THE CREDITORS'

14   COMMITTEE HAS AGREED TO STIPULATE TO THE PAYMENT OF ONE PAY

15   PERIOD WITHOUT PREJUDICE SO THAT THE INSIDERS CAN BE PAID

16   SOMETHING.  THEY HAVEN'T BEEN PAID SINCE THE CASE - AS THEY

17   JUST TESTIFIED - SINCE THE CASE WAS FILED.  THAT STIPULATION I

18   BELIEVE HAS BEEN PROVIDED TO YOUR OFFICE.

19             MS. GREEN:  OKAY.

20   BY MS. GREEN:

21        Q    AND LET ME ASK YOU THIS:  WHAT - ONE PAY PERIOD,

22   THAT'S BI-WEEKLY?  BI-WEEKLY PAY PERIOD?

23        A    (NO AUDIBLE RESPONSE.)

24        Q    YOU HAVE TO SAY "YES" SO THE RECORDER -

25        A    MR. SPRAGG:  I'M SORRY.  YES.

1          Q     AND HOW MUCH CASH ARE WE TALKING TO THAT'S PAID

2    TO - TO INSIDERS ON A BI-WEEKLY BASIS?  WE'RE TALKING ABOUT

3    GROSS.

4          A     MR. MORASH:  GROSS.  THIRTY-FIVE THOUSAND,

5    SOMEWHERE IN -

6          Q     THIRTY-FIVE THOUSAND DOLLARS, GROSS, BI-WEEKLY?

7          A     MR. MORASH:  CORRECT.

8                MR. SPRAGG:  ABOUT THAT.

9                MR. MORASH:  FOR FOUR PEOPLE.

10         Q     AND I GUESS -

11         A     MR. SPRAGG:  - THIRTY-FIVE -

12               MR. MORASH:  IT'S SOMEWHERE AROUND THERE.

13   THAT'S A GUESS.

14   BY MS. GREEN:

15         Q     SO, OKAY.  ALL RIGHT.  AND WHAT ARE WE ASKING

16   FOR FOR EVERYBODY, FOR FOUR PEOPLE, GROSS ON A MONTHLY BASIS?

17         A     MR. MORASH:  SO IT WOULD BE TWICE THAT.

18         Q     SO THAT'S - THAT'S NOT AN ADJUSTED AMOUNT.  SO

19   YOU'RE ASKING FOR $70,000 A MONTH.

20         A     (NO AUDIBLE RESPONSE.)

21         Q     YOU HAVE TO SAY "YES" OR "NO."

22         A     MR. SPRAGG:  YES.

23               MR. MORASH:  I'M SORRY.

24         MR. WINTHROP:  IT'S BEING RECORDED.

25         MR. MORASH:  YES, I KNOW.

1  BY MS. GREEN:

2         Q    NOW, AS I RECALL IN THE INITIAL APPLICATION,

3  THERE WAS SOME MENTION OF SOME SORT OF BONUS.  IS THIS - WHAT'S

4  THE $70,000 PER MONTH INCLUDE?

5         A    MR. MORASH: IT'S STANDARD PAY.

6              MR. SPRAGG:  IT'S JUST THE BASE SALARY.  TO MAKE

7  - TO BE CLEAR, THE ORIGINAL MOTION THAT WAS FILED THREE OR FOUR

8  WEEKS AGO INCLUDED A LISTING OF WHAT WE HAD BEEN PAID IN THE

9  PAST.  THE INTENT WASN'T TO SUGGEST THAT WE GET A BONUS DURING

10 THE -

11        Q    OKAY.  WELL -

12        A    MR. SPRAGG:  - CHAPTER 11 PERIOD -

13        Q    - OKAY.

14        A    MR. SPRAGG:  SO WE - THEN WE FILED ANOTHER

15 MOTION A COUPLE - ABOUT A WEEK AND A HALF AGO, ABOUT TEN DAYS

16 AGO, TO CLARIFY THAT, INDICATING THAT WE'RE ONLY EXPECTING TO

17 RECEIVE OUR - OUR BASE SALARY AND OUR - OUR HEALTH - OUR HEALTH

18 BENEFITS DURING THIS TIME PERIOD, SO THAT'S WHAT WE'VE

19 CLARIFIED IN OUR LATEST FILING.

20        Q    SO WHEN WE TALKED ABOUT THE COMPANY BREAKING

21 EVEN, DID THAT INCLUDE THE $70,000 PER MONTH FOR THE INSIDERS'

22 SALARY?

23        A    MR. MORASH:  NOT FOR WHAT YOU - NOT - NOT FOR

24 WHAT YOU ADDRESSED, NO.

25        Q    OKAY.

22

1          A     MR. MORASH:  IT'S PROBABLY CLOSE - CLOSER TO

2   60,000,.

3          Q     YOU - WHAT?  YOU WOULD BE -

4          A     MR. MORASH:  NO, THE 70,000 IS PROBABLY CLOSER

5   TO 60,000 -

6          Q     OH, OKAY.

7          A     MR. SPRAGG:  - EVERY TWO WEEKS IS - WOULD BE

8   THIRTY THOUSAND -

9                MR. MORASH:  - THIRTY THOUSAND.

10         Q     OKAY.  SO ASSUMING THAT WE KIND OF BREAK EVEN

11  NOW, ONCE WE START PAYING INSIDERS, WE'RE GOING TO BE IN THE

12  HOLE ABOUT $60,000 PER MONTH?  IS THAT FAIR?

13         A     MR. MORASH:  YES.

14         Q     OKAY.

15         A     MR. MORASH:  WELL - THERE ARE IN-FLOWS AT

16  VARIOUS - THERE'S TWO DIFFERENT PERIODS.  THE - THE IN-FLOWS

17  THAT WE GOT DURING THE - THE INITIAL PART, PRIOR TO -

18  SUBSEQUENT TO BANKRUPTCY WERE FAIRLY SIGNIFICANT BECAUSE OF THE

19  SALE OF INVENTORY.

20         Q     OKAY.

21         A     MR. MORASH:  GOING FORWARD, WE KNOW WE HAVE NO

22  GUARANTEES THAT WE'LL BE ABLE TO CONTINUE TO DO THAT.

23         Q     OKAY.

24         A     MR. MORASH:  WHILE WE WILL ATTEMPT TO DO THAT,

25  THERE IS NO- SO THAT WILL PUT US IN A - IN - IN A NEGATIVE

1    CASH-FLOW POSITION GOING FORWARD.

2                Q    - MORE SO THAN THE -

3                A    MR. MORASH:  - AND EVEN MORE SO; CORRECT.

4                     MR. SPRAGG:  IT'S -

5                     MR. MORASH:  - AND THAT'S WHY THE DIP

6    FINANCING -

7                     UNIDENTIFIED SPEAKER: I JUST RAN THE MATH

8    MYSELF.

9                     MR. SPRAGG:  YEAH, EIGHTEEN - ABOUT EIGHTEEN AND

10   A HALF THOUSAND PER WEEK, SO TWICE THAT PER - BI-WEEKLY,

11   THIRTY-SEVEN, BI-WEEKLY.

12                    MR. MORASH:  SOUNDS CLOSER THE FIRST TIME.

13                    MR. SPRAGG:  LET ME SEE WHAT I GOT.

14                    MR. MORASH:  OKAY.

15               Q    OKAY.  AND IS THIS IN LINE WHAT YOU MADE BEFORE?

16               A    MR. MORASH:  YES.

17               Q    OKAY.  BECAUSE I THOUGHT I NOTED SOMEWHERE - YOU

18   FILED IN AUGUST, AND I THOUGHT THAT THE SALARIES WERE ADJUSTED

19   FROM THEIR 2009 LEVELS IN AUGUST, THAT YOU GAVE YOURSELF A

20   RAISE BEFORE THE FILING; IS THAT CORRECT?

21               A    MR. MORASH:  THE BOARD DID A COMPENSATION MARKET

22   STUDY -

23               Q    OKAY.

24               A    MR. MORASH:  - AND ADJUSTED TWO OF THE FOUR

25   PEOPLE'S SALARY BASED ON MARKET, UNDER MEDIAN MARKET.

1    Q    AND THAT WAS IN AUGUST OF – AND WHO GOT

2 ADJUSTED?

3          A    MR. MORASH:  MYSELF –

4          Q    OKAY.

5          A    MR. MORASH:  – THE C.E.O., AND JUSTIN SPRAGG.

6               MR. SPRAGG:  I DID ALSO.  SO YOURS ACTUALLY WAS

7 ADJUSTED IN APRIL OR MAY; RIGHT?

8               UNIDENTIFIED SPEAKER:  RIGHT.

9          Q    AND WHAT PERCENTAGE OF ESTIMATE DID YOU GET?

10         A    MR. MORASH:  I DON'T RECALL OFF THE TOP OF MY

11 HEAD.

12         Q    MR. SPRAGG, HOW ABOUT YOU?  YOURS WAS ADJUSTED

13 IN AUGUST.

14         A    MR. SPRAGG:  YOU WANT TO KNOW WHAT THE PERCENT

15 WAS?

16         Q    YEAH, PERCENT-WISE OR –

17         A    MR. SPRAGG:  ABOUT –

18         Q    – DOLLAR-WISE –

19         A    – TWENTY-FIVE PERCENT OR SOMETHING ALONG THAT

20 LINE.

21         Q    AND WHEN YOU LOOKED AT THOSE STUDIES, WERE THOSE

22 STUDIES THAT WERE BANKRUPT COMPANIES?  WHEN YOU LOOKED AT THE

23 COMPARABLE –

24         A    MR. SPRAGG:  THE STUDY WAS DONE BASED ON MARKET

25 COMPS.  THE STUDY WAS DONE BACK IN APRIL-ISH, ACTUALLY.

1          Q    OKAY.

2          MS. GREEN:  I'M GOING TO – BEFORE I OPEN THIS UP TO

3    CREDITOR QUESTIONS, I'M GOING TO QUICKLY GO DOWN THE LIST OF

4    OUTSTANDING OPERATING REPORTING REQUIREMENTS.  THE MAJORITY OF

5    THINGS ARE IN.  I STILL NEED THE CLOSING BANK STATEMENT TO SHOW

6    THAT THE PRE-PETITION BANK ACCOUNT HAS BEEN CLOSED, AND I NEED

7    THE IMPRINTED CHECK COPY FOR THE DEBTOR-IN-POSSESSION GENERAL

8    ACCOUNT AND PAYROLL ACCOUNT.

9          JUST A REMINDER, THE FIRST MONTHLY OPERATING REPORT

10   IS GOING TO BE DUE SEPTEMBER 20TH, 2010, FOR THE PARTIAL MONTH

11   OF AUGUST, 2010, WHICH WOULD BE FROM 8/10 TO 8/31, SO – DO WE

12   KNOW WHAT THAT LITTLE STUB PERIOD IS GOING TO LOOK LIKE?  IS

13   PROBABLY GOING TO BE A LOSS SINCE – ARE – ARE YOU – ARE YOU

14   PLANNING ON FILING THAT TIMELY?  DO YOU THINK –

15          MR. MORASH:  WE SHOULD BE ABLE TO.

16          MS. GREEN:  OKAY.  I'LL JUST LOOK AT IT THEN.

17          UNIDENTIFIED SPEAKER:  OKAY.

18          MS. GREEN:  AND THEN WE TALKED ABOUT THE APPLICATION

19   TO APPROVE BORROWING, APPLICATION TO EMPLOY PROFESSIONALS, AND

20   I GUESS WE'LL SEE IF WE NEED ANYTHING ELSE ON THE INSIDER

21   COMPENSATION REQUEST BECAUSE I'M NOT QUITE SURE WHAT OUR

22   ATTORNEYS HAVE DONE AT THIS POINT.  I DON'T BELIEVE THAT WE HAD

23   ISSUED A STATEMENT OF POSITION –

24          MR. WINTHROP:  YOU HAVE NOT.

25          MS. GREEN:  I THINK ONE IS IN PROCESS WITH AN

1    OBJECTION.  I'M NOT SURE OF THE DETAILS AT THIS POINT.

2            I AM GOING TO OPEN THIS UP TO CREDITORS' QUESTIONS.

3    IF YOU'D LIKE TO COME FORWARD ONE AT A TIME, PLEASE.

4            MAYBE - DO WE HAVE THE - ANY MEMBERS OF THE

5    CREDITORS' COMMITTEE HERE?

6    DO WE HAVE CREDITORS' COMMITTEE COUNSEL HERE?

7            MR. WINTHROP:  COMMITTEE COUNSEL IS HERE AND PROPOSED

8    COMMITTEE PROFESSIONALS ARE HERE AS WELL.

9            MS. GREEN:  DO - DOES SOMEBODY WANT TO COME UP OR DO

10   YOU WANT TO - WHO - WHO WOULD LIKE TO - COME ON UP.

11           UNIDENTIFIED SPEAKER:  COME ON UP.

12           MS. GREEN:  WHOEVER WOULD LIKE TO COME UP FIRST.

13           MR. DAVIS:  GOOD AFTERNOON, GENTLEMEN.  MY NAME IS

14   JEFF DAVIS.  I'M COUNSEL FOR NEW FLYER (PHONETIC).  I HAVE SOME

15   QUESTIONS I'D LIKE TO ADDRESS TO YOU THIS AFTERNOON.

16   BY MR. DAVIS:

17           Q    LET ME START OFF WITH WE HEARD TESTIMONY THAT

18   YOU NEED THE DIP FINANCING IN - WITHIN THREE WEEKS.  WHY WITHIN

19   THREE WEEKS?  WHAT'S THE ISSUES THAT ARE COMING UP WITHIN THAT

20   THREE-WEEK PERIOD THAT REQUIRES THE FINANCING?

21           A    MR. MORASH:  PAYMENT OF SALARY.

22           Q    SO PAYMENT OF -

23           A    MR. MORASH:  - (UNDISCERNIBLE) -

24           Q    - SALARY FOR THE INSIDERS OR OVERALL SALARY?

25           A    MR. MORASH:  JUST OVERALL SALARY FOR SEVENTY-

1   SOME-ODD PEOPLE THAT ARE WORKING THERE.

2          Q    OKAY.  AND HOW MUCH IS THE BI-WEEKLY SALARY?

3          A    MR. MORASH:  IT'S ABOUT 300,000.

4          Q    ABOUT 300,000 EVERY TWO WEEKS?

5          A    YES.

6          Q    AND WHEN IS PAYROLL DUE?

7          A    MR. MORASH:  LET'S SEE.  PAYROLL WAS - WAS - IT

8   WAS JUST MADE, AND THEN THERE'S ANOTHER PAYROLL IN TWO WEEKS.

9          Q    SO IS THIS PAID ON FRIDAYS?

10         A    MR. MORASH:  YES.

11         Q    OKAY.  SO TWO WEEKS FROM THIS PRIOR FRIDAY,

12  WHICH WOULD HAVE BEEN, I GUESS, THE 1ST?  I'M SORRY, THE 10TH?

13         A    MR. MORASH:  THAT -

14         Q    SO - SO IT WOULD -

15         A    MR. MORASH:  - SOUNDS RIGHT.

16         Q    - IT WOULD BE DUE ON THE 24TH?

17         A    MR. MORASH:  CORRECT.

18         Q    OKAY.  I BELIEVE YOU TESTIFIED ALSO THAT RIGHT

19  NOW THE DEBTOR IS HOLDING A MILLION-FIVE IN CASH.  YOU SAY THAT

20  PAYROLL IS 300,000 -

21         A    MR. MORASH:  NO, I SAID THAT THE CONSOLIDATED IS

22  A MILLION-FIVE.  I THINK THE DEBTOR HAS GOT ABOUT 900,000.

23         Q    THE DEBTOR HAS GOT ABOUT 900,000.  AND YOU SAY -

24  YOU SAID CONSOLIDATED WAS A MILLION-FIVE?

25         A    MR. MORASH:  CORRECT.

1          Q     AND YOU – YOU NEED TO SPEAK UP.  IT'S BEING

2     RECORDED.

3               A     MR. MORASH:  SORRY.  YES.

4          Q     AND WHEN YOU SAY CONSOLIDATED, WHAT DO YOU MEAN?

5     CONSOLIDATED WITH WHOM?

6               A     MR. MORASH:  THE PARENT COMPANY.

7          Q     THE PARENT COMPANY.

8               A     MR. MORASH:  CORRECT.

9          Q     SO DO YOU COUNT THE PARENT MONEY AS MONEY OF THE

10    DEBTOR?

11              A     MR. MORASH:  NO.

12         Q     OKAY.  WHY DID YOU INDICATE A MILLION-FIVE THEN

13    ON A CONSOLIDATED BASIS.  WHAT RELEVANCE DOES THAT HAVE TO THE

14    DEBTOR'S CASH ON HAND, WHICH WAS THE QUESTION?

15              A     MR. MORASH:  I MADE A MISTAKE.

16         Q     OKAY.  SO THE DEBTOR HAS 900,000 IN CASH, AS WE

17    SIT HERE TODAY.

18              A          MR. SPRAGG:  THE DEBTOR ITSELF HAS 900,000

19    IN CASH, CORRECT.

20                   MR. MORASH:  THAT'S CORRECT.

21         Q     AND –

22              A     MR. MORASH:  AND LAST FRIDAY WAS A --

23         Q     EXCUSE ME?

24              A     MR. MORASH:  LAST FRIDAY WAS THE – WAS THE PAY

25    PERIOD, SO THE NEXT ONE WILL BE THE 24TH.

1          Q     RIGHT.  THANK YOU.

2          A     MR. MORASH:  PLUS THAT'S IN ARREARS, SO IT TAKES

3   TWO MORE WEEKS BEYOND THAT.

4          Q     SO YOU PAY TWO WEEKS IN ARREARS?

5          A     MR. MORASH:  TWO WEEKS IN ARREARS.

6          Q     SO THE PAYMENT ON THE 24TH WOULD BE FOR SERVICES

7   RENDERED THROUGH THE 10TH?

8          A     MR. MORASH:  UH-HUH.

9          Q     OKAY.  WHAT OTHER EXPENSES ARE YOU ANTICIPATING

10  IN THE NEXT THREE WEEKS THAT YOU WOULDN'T BE ABLE TO MEET

11  PAYROLL OUT OF THE $900,000 IN CASH THAT'S IN THERE NOW?

12         A     MR. MORASH:  WELL, YOU'VE GOT – SO YOU'VE GOT

13  900,000, YOU'VE GOT 600,000 THAT WOULD BE PAYROLL, BECAUSE

14  OBVIOUSLY YOU HAVE TO HAVE CASH ON HAND FOR THE PAYROLL THAT

15  YOU'VE INCURRED.  THERE'S – THERE'S HEALTH INSURANCE, THERE'S

16  RENT, AND VARIOUS MISCELLANEOUS EXPENSES RELATING TO KEEPING

17  THE BUSINESS GOING.

18         Q     OKAY, SO THE EXPECTATION IS OVER THE NEXT THREE

19  WEEKS, THE COMPANY WILL NOT BE BREAK-EVEN?

20         A     MR. MORASH:  CORRECT.

21         Q     DO YOU –

22         A     MR. MORASH:  I DON'T – AT THIS STAGE OF THE

23  GAME, YOU KNOW, IF YOU CAN TELL ME HOW MUCH NEW FLYER IS GOING

24  TO BUY IN THE WAY OF – OF SPARE PARTS, I CAN TELL YOU WHAT THE

25  CASH FLOW IS GOING TO BE.

1          Q    - HAVE YOU PREPARED PRO FORMA WEEKLY CASH FLOW

2    STATEMENTS?

3          A    MR. MORASH:  YES.

4          Q    AND HAVE THOSE BEEN PROVIDED TO THE U.S.

5    TRUSTEE?

6          A    MR. MORASH:  YES.

7          Q    AND - AND THOSE INDICATE THAT THE DEBTOR RUNS

8    OUT OF CASH WHEN?

9          A    MR. MORASH:  WELL, IT - THEY INCLUDE ALSO DIP

10    FINANCING, BUT IF YOU TOOK THE DIP FINANCING OUT, I THINK THERE

11    ARE ROUGHLY THREE WEEKS.  I THINK THAT'S THE TIME FRAME.

12          Q    ON THE DIP FINANCING, HOW MUCH IS THE DEBTOR

13    SEEKING?

14          A    MR. MORASH:  TWO MILLION.

15               MR. SPRAGG:  IT'S A LINE OF CREDIT FOR TWO

16    MILLION -

17               MR. MORASH:  - A LINE OF CREDIT.

18               MR. SPRAGG:  IT WOULD NOT ALL BE DRAWN AT ONCE,

19    OBVIOUSLY.

20          Q    AND YOU'VE INDICATED THAT YOU'VE INDENTIFIED A

21    POTENTIAL LENDER?

22          A    MR. MORASH:  CORRECT.

23          Q    ARE YOU NEGOTIATING WITH A SINGLE POTENTIAL

24    LENDER AT THIS POINT IN TIME OR IS THERE STILL NEGOTIATIONS

25    WITH MULTIPLE LENDERS?

1          A      MR. MORASH:  A SINGLE LENDER.

2          Q      AND IS THAT LENDER AN INSIDER?

3          A      MR. MORASH:  NO.

4          Q      IS THAT LENDER A POTENTIAL PURCHASER?

5          A      MR. MORASH:  I DON'T KNOW.

6          Q      SO TO - TO YOUR KNOWLEDGE, THE - AT LEAST THE

7    DISCUSSION SO FAR IS NOT - IS THAT - IS NOT THAT THE LENDER IS

8    PURCHASE - IS LENDING TO EVENTUALLY MAKE A BID TO PURCHASE.

9          A      MR. SPRAGG:  CURRENTLY THE LENDER IS IN THE

10   EXACT OPPOSITE.  THEY'VE INDICATED THEY MAY BE INTERESTED IN

11   THE FUTURE, BUT AT THIS POINT, THAT'S NOT THEIR CURRENT INTENT.

12         Q      THANK YOU.

13         AND THE EXPECTATION IS THAT YOU'LL BE BEFORE THE

14   COURT WITH A MOTION WHEN?  I KNOW YOU SAID YOU NEED IT WITHIN

15   THREE WEEKS.  WHEN DO YOU BELIEVE THE MOTION WILL BE FILED?

16         MR. WINTHROP:  HOPEFULLY IN THE NEXT SEVEN TO TEN

17   DAYS.

18   BY MR. DAVIS:

19         Q      THEN YOU'VE INDICATED THAT THE FINANCING IS

20   ESSENTIALLY A BRIDGE TO A 363 SALE; IS THAT CORRECT?

21         A      MR. SPRAGG:  THAT'S RIGHT, YES.

22         MR. MORASH:  YES.

23         Q      DOES THE DEBTOR SEE THAT AS THE ONLY LIKELY

24   RESULT OF THIS PROCEEDING, OF THIS BANKRUPTCY?

25         A      MR. SPRAGG:  I WOULDN'T SAY "ONLY," NO.  BUT

1  RIGHT NOW, IT LOOKS LIKE THE MOST LIKELY.

2          Q    WHAT - WHAT OTHER POTENTIAL RESULTS DO YOU SEE?

3          A    MR. SPRAGG:  WE COULD HAVE A RESTRUCTURING.  IT

4  DEPENDS ON - WHOEVER COMES UP WITH THE MONEY, IT REALLY DEPENDS

5  ON WHAT THEY WANT TO DO.

6          Q    SO IN OTHER WORDS, IF THEY COME IN AS AN

7  INVESTOR, THEN YOU MIGHT BE LOOKING AT A RESTRUCTURE?

8          A    MR. SPRAGG:  SURE.

9          Q    THERE WERE SOME QUESTIONS ASKED ABOUT INSIDER

10 COMPENSATION, AND I BELIEVE YOUR C.E.O. INDICATED THAT HE

11 DIDN'T RECALL THE PERCENTAGE INCREASE IN COMPENSATION, AND I

12 CAN UNDERSTAND NOT RECALLING A PERCENTAGE, BUT WHAT WAS - WHAT

13 IS THE PRESENT SALARY OF THE C.E.O.?

14         A    MR. SANDER:  THREE TWENTY-FIVE.

15         Q    PER YEAR?

16         A    MR. SANDER:  YES.

17         Q    AND WHAT WAS THE PRIOR SALARY, PRIOR TO THE

18 SALARY PRIOR TO THE SALARY ADJUSTMENT?

19         A    MR. SANDER:  THREE SIXTY - 265.

20         Q    THANK YOU.

21         WE'LL FIGURE OUT THE PERCENTAGE, I GUESS.

22         MR. SANDER: IT'S IMPORTANT.

23 BY MR. DAVIS:

24         Q    I NOTICE THAT THE LANDLORD FILED A MOTION FOR

25 RELIEF FROM STAY BECAUSE THE LANDLORD WASN'T PAID.  HAS THE

1    LANDLORD BEEN PAID NOW?

2              A    MR. MORASH:  YES.

3              MR. SANDER:  WE'VE CUT – A DEAL HAS BEEN MADE

4    WITH THE LANDLORD.  AND IT HAS BEEN PAID FOR ONE MONTH, BUT THE

5    STUB PERIOD – IT'S GOING TO BE PAID OVER A THREE-MONTH PERIOD.

6              Q    OKAY.

7              MR. SANDER: IT SOUNDS LIKE A REASONABLE RESULT.

8    BY MR. DAVIS:

9              Q    IN THE STATEMENT OF AFFAIRS THAT THE COMPANY

10   FILED, IT LISTED PAYMENTS ON THE PETITION DATE TO I.S.E.,

11   LIMITED, IN THE AMOUNT OF $600,000.  WHAT WAS – WHAT WAS THAT

12   PAYMENT FOR, OR THOSE SERIES OF PAYMENTS FOR?

13             A    MR. MORASH:  THAT WAS A RETURN OF – OF A LOAN

14   THAT WAS MADE – FROM THE – FROM THE PARENT COMPANY.

15             Q    AND WHEN WAS THAT LOAN MADE BY THE PARENT

16   COMPANY?

17             A    MR. MORASH:  FEBRUARY 22ND – TWENT SOMETHING OR

18   ORTHER.

19             MR. SPRAGG:  – 23RD.

20             MR. MORASH:  THE 23RD

21        Q    OF 2010?

22        A    MR. MORASH:  UH-HUH, YES.

23        Q    WAS IT MADE AS A LUMP-SUM PAYMENT OF 600,000?

24        A    MR. MORASH:  WHICH – THE LOAN –

25        Q    WELL, THE – THE –

1        A     MR. MORASH:  - THE RETURN OF THE LOAN OR THE

2   LOAN?

3        Q     - THE PAYMENT, THE LOAN ITSELF.

4        A     MR. MORASH:  THE LOAN ITSELF WAS TWELVE -

5   ROUGHLY $12 MILLION.

6        Q     AND WAS THAT SUBJECT TO A SECURITY AGREEMENT,

7   THAT LOAN?

8        A     MR. MORASH:  NO.

9        Q     WHY WAS 600,000 PAID - I - YOU KNOW, I'VE HEARD

10  THAT YOU HAD A LIQUIDITY ISSUE, AND THAT'S WHAT CAUSED THE

11  FILING.  WHY WAS $600,000 PAID TO THE PARENT ON THE PETITION

12  DATE?

13       A     MR. MORASH:  THE PARENT NEEDED CASH TO MEET ITS

14  OBLIGATIONS.

15       Q     AND WHAT OBLIGATIONS DID THE PARENT HAVE?

16       A     MR. MORASH:  FILING - ALSO -

17       Q     IS IT- YOU SAID FILING?  FILING WHAT?

18       A     MR. SPRAGG:  IT'S A PUBLIC COMPANY.

19             MR. MORASH:  IT'S A PUBLIC COMPANY FILING COSTS.

20       UNIDENTIFIED SPEAKER:  PUBLIC COMPANY EXPENSES.

21       MR. DAVIS:  OKAY.

22  BY MR. DAVIS:

23       Q     IT'S A CANADIAN PUBLIC COMPANY?

24       A     MR. MORASH:  CORRECT.

25       Q     OKAY.  AND SO SOMETHING SIMILAR TO A 10(K)?

1          A     MR. MORASH:  S.E.C. TYPE.

2          Q     S.E.C.  AN EIGHT OR WHATEVER.  OKAY.

3          A     MR. MORASH:  RIGHT.

4          Q     OKAY.  SO AN ANNUAL FILING?

5          A     MR. MORASH:  IT WAS A LEGAL –

6              MR. SPRAGG:  JUST SOME GENERAL COSTS –

7              MR. MORASH:  - FILING COSTS IN GENERAL.

8          Q     OKAY.  FILING COSTS.

9          A     MR. MORASH:  THERE'S –

10        MR. MORASH:  - REPORTING COSTS, THERE'S LEGAL COSTS,

11 THERE'S, YOU KNOW, ET CETERA.  ALL THE – THE KIND OF PUBLIC

12 COMPANY COSTS THAT YOU – –

13        MR. DAVIS:  OKAY.

14        MR. MORASH:  - INCUR.).

15 BY MR. DAVIS:

16          Q     AND WHO – WHO WERE THE MEMBERS OF THE BOARD OF

17 DIRECTORS OF THE DEBTOR?

18          A     MR. SPRAGG:  LET ME TAKE A CRACK AT IT, AND –

19              MR. MORASH:  OKAY.

20              MR. SPRAGG:  - ALL RIGHT.  SO YOU'RE GOING TO

21 HAVE PHIL, PHILIP DEUTSCH (PHONETIC), YOU'RE GOING TO HAVE

22 ALEXANDER ELLIS, HAVE GERD GOETTE.

23          Q     I'M SORRY.  WHAT WAS THAT LAST NAME?

24          A     MR. SPRAGG:  G-O-E-T-T-E –

25              MR. MORASH:  - E-T-T-E.

1          Q     AND WHAT'S THE FIRST NAME?

2          A     MR. SPRAGG:  GERD, G-E-R-D.

3          Q     OKAY.

4          A     MR. SPRAGG:  YOU'RE GOING TO HAVE MICHAEL SEARS
5    (PHONETIC), MICHAEL GOODMAN (PHONETIC) - I'M SORRY, DAVID
6    GOODMAN (PHONETIC), MARK QUALLUM (PHONETIC) -

7          Q     MARK WALLMAN (SIC)?

8          A     MR. SPRAGG:  QUALLUM, RICK SANDER, OBVIOUSLY,
9    AND WE HAVE GORDON BAREFOOT (PHONETIC).

10               MR. MORASH:  AND DAVID NAZAIKA.

11               MR. SPRAGG:  AND DAVID NAZAIKA.  THAT'S RIGHT.

12         Q     DAVID BOZAK (SIC)?

13         A     MR. SPRAGG:  N-A-Z-A-I-K-A, I BELIEVE.

14         Q     AND DID THE BOARD OF DIRECTORS MEET AND
15   DETERMINE TO MAKE THAT $600,000 PAYMENT TO I.S.E., LIMITED?

16         A     MR. SPRAGG:  I DON'T RECALL.

17         Q     MR. SANDER, WERE YOU PRESENT AT THE LAST MEETING
18   OF THE BOARD OF DIRECTORS?

19         A     MR. SANDER:  YES.  WE'D BEEN HAVING - THE LAST
20   TWO WEEKS, WE'D BEEN HAVING A BOARD MEETING EVERY WEEK.  PRIOR
21   TO THAT, IT WAS TWICE A WEEK.  SO -

22         Q     DID THE BOARD OF THE DEBTOR AUTHORIZE THE
23   $600,000 PAYMENT TO I.S.E., LIMITED, ON THE DATE IT FILED ITS
24   BANKRUPTCY PETITION?

25         A     MR. SANDER:  I BELIEVE SO.  I - I WOULD HAVE TO

1   GO BACK TO THE NOTES.

2           Q    DID THE BOARD EVER APPROVE THAT PAYMENT?

3           A    MR. SANDER:  I WOULD HAVE TO GO BACK TO THE

4   NOTES.  I - I DON'T KNOW.

5           Q    AND -

6           A    MR. SANDER:  WE WERE MAKING A LOT OF - THERE

7   WERE A LOT OF DISCUSSIONS ABOUT A LOT OF TOPICS.  I - I WOULD

8   HAVE TO GO BACK TO THE NOTES TO RECALL THAT.

9           Q    OKAY.  SO IF A PAYMENT WAS APPROVED BY THE

10  BOARD, WOULD IT HAVE BEEN APPROVED WITHIN A COUPLE WEEKS BEFORE

11  THE FILING DATE?  OR - OR BEFORE THAT?

12          A    MR. SANDER:  WELL, I DON'T KNOW.  I DON'T KNOW.

13          Q    OKAY.

14          A    MR. SANDER:  I - I'D LIKE TO GO BACK.  WE - WE

15  TOOK COPIOUS NOTES, OBVIOUSLY, WITH COUNSEL INVOLVED AT EVERY

16  ONE OF OUR BOARD MEETINGS, SO THE RECORD OF THAT, WE CAN GO

17  BACK AND FIND OUT.

18          Q    OKAY.  SO IT'S NOT MEMORABLE - AS YOU SIT HERE

19  TODAY, IT'S NOT MEMORABLE ENOUGH SO THAT YOU REMEMBER A MONTH

20  AGO WHETHER YOUR BOARD APPROVED IT OR NOT; IS THAT CORRECT?

21          A    MR. SANDER:  THAT'S RIGHT.

22          MS. GREEN:  I WOULD LIKE TO REQUEST THOSE MINUTES OF

23  THE BOARD OF DIRECTORS MEETINGS SHOWING THAT APPROVAL AS ONE OF

24  OUR OPERATING REPORTING REQUIREMENTS.  OKAY?  CAN YOU GET THOSE

25  TO ME?

1                    (NO AUDIBLE RESPONSE.)

2    BY MR. DAVIS:

3            Q    MR. SANDER, WAS IT CONSIDERED BY THE BOARD OF

4    DIRECTORS OF THE DEBTOR WHAT EFFECT THAT $600,000 PAYMENT TO

5    I.S.E. WOULD HAVE UPON THE DEBTOR IN ITS OPERATIONS?

6            A    MR. SANDER:  I THINK THE - THE BOARD WAS TRYING

7    TO BE RESPONSIBLE AND LOOKING AT ALL THE - THE DEBT AND

8    OBLIGATIONS OF THE - OF THE COMPANY AND COMPANIES, AND I THINK

9    ACTED IN THE BEST INTERESTS OF -

10           Q    BEST INTERESTS OF WHOM?

11           A    MR. SANDER:  - THE CORPORATION AT THAT TIME.

12           Q    WHICH CORPORATION?

13           A    MR. SANDER:  THE COMBINED COMPANIES.

14           Q    THE COMBINED COMPANIES?

15           A    MR. SANDER:  RIGHT.

16           Q    AND SO YOU VIEWED YOUR ROLE AS A MEMBER OF THE

17   BOARD AS REPRESENTING BOTH COMPANIES AT THE SAME TIME?

18           A    PRIOR TO FILING, YES.

19           Q    SINCE FILING, HOW DO YOU VIEW THAT?

20           MR. SANDER:  MARK?

21           MR. WINTHROP:  YEAH, I - GO AHEAD.

22           MR. SANDER:  YOU KNOW, I -

23           MR. DAVIS:  THIS IS THE ADMINISTRATION OF THE CASE,

24   MR. WINTHROP.

25           MR. WINTHROP:  YES, AND IT'S A MEMBER OF THE BOARD OF

1  DIRECTORS OF THE DEBTOR.

2          MR. DAVIS:  CORRECT.  THAT'S THE REQUEST FOR THE ROLE

3  THAT I'M ASKING THIS QUESTION.

4          MR. WINTHROP:  AND THE ANSWER WOULD BE HE VIEWS

5  HIMSELF AS REPRESENTING THE DEBTOR.

6          MR. DAVIS:  I - I'D LIKE THE WITNESS TO TESTIFY

7  INSTEAD OF THE ATTORNEY TESTIFYING.

8          MR. WINTHROP:  WELL, YOU'RE ASKING FOR A LEGAL

9  CONCLUSION.

10          MR. DAVIS:  NO, I'M ASKING FOR HIS UNDERSTANDING, I'M

11  ASKING FOR HIS OPINION.

12          MR. SANDER:  YES, THE CALIFORNIA CORPORATION IS THE

13  DEBTOR.

14          MR. DAVIS:  NO, THAT'S NOT THE QUESTION.

15  BY MR. DAVIS:

16          Q    THE QUESTION IS:  SINCE THE FILING -

17          A    MR. SANDER:  YES.

18          Q    - AS A MEMBER OF THE BOARD OF DIRECTORS -

19          A    MR. SANDER:  YES.

20          Q    - OF THE DEBTOR, HAVE YOU CHANGED YOUR VIEW

21  WHICH YOU HELD, WHICH YOU INDICATED YOU HELD PREVIOUSLY, THAT

22  YOU WERE ACTING IN THE BEST INTERESTS OF BOTH COMPANIES SO THAT

23  PRESENTLY, YOU HAVE -

24          A    MR. SANDER: THE BEST INTEREST OF THE DEBTOR.

25  BY MR. DAVIS:

1            Q    - BEST INTERESTS OF THE DEBTOR?

2            A    MR. SANDER:  RIGHT.  POST-FILING.

3            Q    OKAY.  IF THE $600,000 HAD NOT BEEN PAID TO

4    I.S.E., LIMITED, ON THE PETITION DATE, WOULD YOU STILL NEED,

5    THE COMPANY STILL NEED - WOULD THE COMPANY STILL NEED FINANCING

6    WITHIN THREE WEEKS?

7            A    MR. MORASH:  IT MIGHT BE FOUR WEEKS.

8            Q    FINANCING WOULD STILL BE REQUIRED THOUGH?

9            A    MR. MORASH:  FINANCING WOULD STILL BE REQUIRED.

10   THE ISSUE WASN'T THAT IT WOULD NOT REQUIRE, THE ISSUE WAS IT

11   WAS REQUIRED IS THE QUESTION, YOU KNOW, WHETHER YOU HAD AN

12   EXTRA WEEK OR SOMETHING LIKE THAT.

13           MR. SPRAGG:  I THINK TO BE CLEAR, THE DIRECTORS

14   HAVE FIDUCIARY DUTIES TO BOTH THE DEBTOR AND TO THE PARENT

15   COMPANY.  THEY HAPPEN TO BE THE SAME PEOPLE, SO THEY HAD TO

16   MAKE THE DETERMINATIONS BASED ON - THERE'S TWO DIFFERENT SETS -

17   THERE'S TWO DIFFERENT BOARDS HERE, SO WHEN DETERMINATIONS ARE

18   MADE WITH RESPECT TO THE PUBLIC COMPANY, THERE'S A SEPARATION

19   BETWEEN THAT AND - AND THE DEBTOR, SO WHEN ASKING, YOU KNOW,

20   WHY THE MONEY WAS TRANSFERRED, YOU'VE GOT TO UNDERSTAND THAT

21   THE DIRECTORS ALSO HAVE AN OBLIGATION TO THE - TO THE PARENT

22   COMPANY ALSO.

23           MR. MORASH:  PRE-FILING.

24           MR. SPRAGG:  RIGHT.  PRE-FILING.

25           Q    AS A BOARD THEY DO?

1          A     MR. SPRAGG:  THE BOARD OF DIRECTORS OF I.S.E.,

2    LIMITED HAS A FIDUCIARY DUTY TO I.S.E., LIMITED, YES.

3          Q     OKAY.  YOU INDICATED THAT THERE WERE TWO

4    SEPARATE BOARDS.

5          A     MR. SPRAGG:  THAT IS CORRECT.

6          Q     DO THEY MEET SEPARATELY?  OR DO THEY SIT AT ONE

7    TIME?

8          A     MR. SPRAGG:  THEY – IT'S – THEY DO MEET

9    SEPARATELY, THEY DO MEET AT THE SAME TIME.  IT DEPENDS ON WHAT

10   – WHAT'S AT ISSUE.

11              MR. MORASH:  BUT WHENEVER THERE'S A RESOLUTION,

12   IT'S CLEAR THE RESOLUTION IS FOR WHICH – WHICH CORPORATION.

13         Q     IS THERE A – IS THERE ANY DIFFERENCES IN YOUR

14   CONSTITUENT MEMBERS OF THE TWO BOARDS?

15         A     MR. SPRAGG:  NO, THE SAME – SAME MEMBERS?

16         Q     IS COUNSEL PRESENT AT THE BOARD MEETINGS?

17         A     MR. SPRAGG:  MOST OF THEM.

18         Q     HAS THERE EVER BEEN A BOARD MEETING WHEN THE TWO

19   COMPANIES HAVE BEEN REPRESENTED BY DIFFERENT COUNSEL?

20         A     MR. SPRAGG:  NO.

21         Q     SO COUNSEL REPRESENTS BOTH COMPANIES AT THE

22   BOARD MEETINGS?

23         A     MR. SPRAGG:  THAT'S CORRECT.

24              MS. GREEN:  MR. DAVIS –

25              MR. SPRAGG:  WE ACTUALLY – WE ACTUALLY HAVE DIFFERENT

1   COUNSEL, SO WE JUST DON'T HAVE ONE. WE'VE GOT CANADIAN COUNSEL

2   THAT - THAT NOT ONLY REPRESENTS THE PARENT COMPANY, BUT WE ALSO

3   HAVE U.S. COUNSEL THAT REPRESENTS BOTH -- BOTH ENTITIES, SO WE

4   HAVE A NUMBER OF DIFFERENT LAW FIRMS THAT WE ENGAGE.

5           MR. DAVIS:  I JUST NEED ABOUT THREE MORE MINUTES.

6           MS. GREEN: SURE.

7   BY MR. DAVIS:

8           Q   IN FILLING OUT THE SCHEDULES OF ASSETS AND

9   LIABILITIES, HAS THE DEBTOR LISTED ANY AMOUNTS FOR LIABILITY ON

10  WARRANTY CLAIMS?

11          A   MR. MORASH:  I DON'T BELIEVE SO.

12          Q   OKAY.

13          MR. SPRAGG:  ESTIMATED LIABILITY FOR WARRANTY CLAIMS

14  THAT HAVE BEEN MADE AS OF THE DATE WE FILED, AS OF WHEN?

15  BY MR. DAVIS:

16          Q   WELL, THAT EITHER HAVE BEEN MADE OR CONTINUED -

17  ANY - ANY EST- - ANY INCLUSION OF ANY ESTIMATES FOR WARRANTY

18  OBLIGATIONS.

19          A   MR. SPRAGG:  I DON'T KNOW WHERE IN THE SCHEDULES

20  THAT WOULD SHOW UP.  I THINK WE ASKED - WERE ASKED WHAT WERE

21  OUR OUT- - OUTSTANDING OBLIGATIONS AS OF THE DATE WE FILED -

22  OR, YOU KNOW, CLAIMS AGAINST US, SO IF YOU COULD SHOW US WHERE

23  WE WOULD HAVE INSERTED THAT PARTICULAR PIECE INFORMATION -

24  CONTINGENT LIABILITIES?  IS THAT WHAT YOU'RE ASKING?

25  BY MR. DAVIS:

1          Q      NO. THE POTENTIALLY CONTINGENT LIABILITIES BUT

2   THE DEBTOR IS SUPPOSED TO INCLUDE ALL CLAIMANTS, ALL POTENTIAL

3   CREDITORS IN THEIR SCHEDULE – AMONG THE VARIOUS SCHEDULES, BUT

4   ESPECIALLY SCHEDULE F.  AND IT WOULD THEN INDICATE WHETHER

5   THOSE CLAIMS ARE CONTINGENT, LIQUIDATED, OR DISPUTED.

6          A      MR. SPRAGG:  LET'S START WITH NEW FLYER.  NEW

7   FLYER IS INCLUDED AS PART OF SCHEDULE G.

8          Q      THAT'S NOT MY QUESTION.

9          A      MR. SPRAGG:  I KNOW IT'S NOT.

10         Q      HAS THE DEBTOR SET FORTH ITS ESTIMATE OF

11  WARRANTY OBLIGATIONS IN ITS SCHEDULES AT ANY POINT IN TIME,

12  ANYWHERE IN THE SCHEDULES?

13         A      MR. SPRAGG:  I DON'T THINK IT'S BEEN BROKEN OUT

14  SPECIFICALLY.

15         Q      WELL, IS IT LISTED FOR ANY ONE ENTITY?  WHEN YOU

16  SAY IT'S NOT BROKEN OUT SEPARATELY, WHAT – IS IT INCLUDED IN

17  SOME OF THE ENTITIES, SOME OF THE LISTINGS FOR SOME OF THE

18  ENTITIES?

19         A      MR. SPRAGG:  THIS IS F.

20         Q      I ASSUME THE ANSWER IS "NO."

21         A      MR. SPRAGG:  I DON'T THINK SO.

22         MR. DAVIS:  OKAY.

23  BY MR. DAVIS:

24         Q      SO YOU HAVEN'T LISTED WARRANTY CLAIMS.  ARE YOU

25  AWARE OF ANY WARRANTY CLAIMS?

1          A    MR. SPRAGG:  THERE LIKELY WILL BE ONCE WE, YOU

2    KNOW, REJECT CONTRACTS.

3          Q    OKAY.  SO IN – UNTIL YOU REJECT CONTRACTS YOU

4    DON'T VIEW ANYBODY AS HAVING A POTENTIAL WARRANTY CLAIM?

5          A    MR. SPRAGG:  THAT'S NOT WHAT I SAID.

6          Q    WELL, WHY WOULD YOU HAVE NOT LISTED THEM NOW BUT

7    WOULD LIST THEM AFTER REJECTION?

8          A    MR. SPRAGG:  WE MIGHT HAVE A MISTAKE IN FILLING

9    OUT THE FORMS.

10         Q    OKAY.  THAT'S FINE.

11         ARE THERE POTENTIAL WARRANTY CLAIMS THAT EXIST?  I

12   KNOW YOU UNDER – I UNDERSTAND THAT YOU MAY DISPUTE THEM, AND

13   I'M NOT ASKING JUST WITH RESPECT TO NEW FLYER, I'M ASKING IN

14   GENERAL, WITH RESPECT TO ANY CUSTOMERS, ARE THERE POTENTIAL

15   WARRANTY CLAIMS THAT EXIST?

16         A    MR. SPRAGG:  POTENTIAL WARRANTY CLAIMS?

17         Q    YES.

18         A    MR. SPRAGG:  WELL, ALMOST BY DEFINITION THERE

19   WOULD BE POTENTIAL WARRANTY CLAIMS IF WE SOLD PRODUCT, SO I

20   GUESS THE ANSWER WOULD BE – WOULD BE YES, THERE ARE POTENTIAL

21   CLAIMS.

22         Q    ARE YOU AWARE OF ANY CUSTOMER WHO HAS MADE

23   WARRANTY CLAIMS OR HAS INDICATED AN INTENTION TO MAKE WARRANTY

24   CLAIMS?

25         A    MR. SPRAGG:  WE'VE HAD A LOT OF CONVERSATIONS

45

1  OVER THE PAST TWO MONTHS, SO ABOUT WARRANTY AND WHAT ARE – WHAT

2  ARE – AND WHAT OUR PLANS ARE, YOU KNOW, GOING THROUGH THIS

3  PROCESS.  SO THERE HAS BEEN A LOT OF DISCUSSIONS ABOUT WARRANTY

4  AND WHAT WE'RE GOING TO DO, SO WITH RESPECT TO THE CHAPTER 11

5  PROCESS.

6          Q    AND I TAKE IT THEREFORE THAT THERE HAVE BEEN

7  DISCUSSIONS OF – WITH CUSTOMERS ABOUT WARRANTY CLAIMS.

8          A    MR. SPRAGG:  CUSTOMERS BEING OEM'S. NEW FLYER.

9          Q    THE CUSTOMERS.

10         A    MR. SPRAGG:  OKAY.

11         Q    SO IF YOU HAD THOSE DISCUSSIONS, THEY SHOULD

12 HAVE BEEN INCLUDED IN THE SCHEDULES, AND – IS THAT CORRECT?

13         A    MR. SPRAGG:  I DON'T KNOW.  I WAS GOING TO REFER

14 TO COUNSEL IF THAT WAS – I DON'T KNOW HOW THAT WOULD HAVE BEEN

15 VALUED.  WE DON'T KNOW. MAYBE WE MADE A MISTAKEN IN – IN

16 FILLING OUT THE SCHEDULES AND WE SHOULD UPDATE.

17         MR. DAVIS:  ALL RIGHT.  AND COUNSEL, YOUR COUNSEL,

18 HAS INDICATED THAT THEY'RE DIFFICULT TO VALUE, AND I

19 UNDERSTAND, BUT STILL –

20         MR. SPRAGG:  THERE WILL BE – THERE WILL BE A –

21 BY MR. DAVIS:

22         Q    – AS A LIQUIDATED – AS AN UNLIQUIDATED AMOUNT.

23         MR. WINTHROP:  WELL, I THINK WE WERE PRETTY CLEAR ON

24 SCHEDULE G THAT WE'VE GOT A LOT OF EXECUTORY CONTRACTS, AND IF

25 YOU LOOK AT SCHEDULE G, THERE MUST BE FORTY ENTRIES FOR NEW

1    FLYER IN THERE, AS FAR AS THE AGREEMENTS, AND WE JUST FILED -

2    I THINK FILED ON YESTERDAY THE CONTRACTS WE EXPECT - WHERE WE

3    DO PLAN ON REJECTING, WHICH INCLUDES NEW FLYER, SO WE'VE BEEN

4    VERY CLEAR THAT WE'RE REJECTING A CERTAIN NUMBER OF AGREEMENTS,

5    AND THOSE AGREEMENTS DO HAVE WARRANTY OBLIGATIONS, SO I THINK

6    ON THE INFORMATION WE CURRENTLY HAVE, WE WILL BE ABLE TO

7    DETERMINE WHAT, YOU KNOW, BASED ON YOUR RELATIONSHIP WITH NEW

8    FLYER, WHAT NEW FLYER'S PLAN WOULD BE.

9        MR. SPRAGG:  - AND WE HAVE - WE DO INTEND TO OBTAIN A

10   BAR DATE BY WHICH PARTIES CAN FILE CLAIMS, BUT I THINK IT WOULD

11   HAVE BEEN UNREALISTIC TO THINK WE CAN, YOU KNOW, COME UP WITH A

12   NUMBER NOW FOR POTENTIAL WARRANTY CLAIMS.  IT'S POSSIBLE THAT

13   ALL OUR VEHICLES WILL - WILL PERFORM 100 PERCENT ADEQUATELY,

14   AND THERE WON'T BE ANY WARRANTY CLAIMS.

15   BY MR. DAVIS:

16       Q    BUT YOU ALSO KNOW THAT THAT'S NOT THE CASE.

17       A    MR. SPRAGG:  IT'S NOT LIKELY, BUT -

18       Q    YOU KNOW FACTUALLY THAT'S NOT THE CASE.

19       A    MR. SPRAGG:  BUT IT IS - IT IS VIRTUALLY

20   IMPOSSIBLE TO COME UP WITH A NUMBER OF PROJECTED WARRANTY

21   CLAIMS.

22       MR. SANDER:  I THINK WHAT WE NEGLECT TO NOTICE -- I

23   THINK WE NEED TO GO BACK, LOOK AT SCHEDULE G.  YOU'LL SEE WE'VE

24   GOT A LOT OF NEW FLYER AGREEMENTS LISTED THERE, AND WE ARE

25   PLANNING ON REJECTING MOST OF THOSE.  WE FILED A MOTION

1   YESTERDAY REJECTING THOSE.

2          MR. DAVIS:  I HAVEN'T SEEN ANY MOTION.

3          MR. WINTHROP:  I THINK WE DID THE LIST YESTERDAY.

4   THE MOTION HAS TO BE DRAFTED.

5          MR. DAVIS:  DID YOU FILE THAT IN A DIFFERENT COURT?

6          MR. WINTHROP:  NO, IT MUST HAVE BEEN - IT IS MY

7   UNDERSTANDING - NO, WE HAVE NOT FILED THE MOTION YET TO MY

8   KNOWLEDGE.  IT'S - WE HAVE RECEIVED THE LIST.  A MOTION WILL BE

9   FILED.

10          MR. SPRAGG:  AND I - IF IT WASN'T FILED YESTERDAY, IT

11   WILL BE FILED THIS WEEK FOR SURE.  IT WAS TO BE.  ALL THE

12   INFORMATION HAS BEEN PROVIDED TO COUNSEL TO FILE.

13   BY MR. DAVIS:

14          Q    SO YOU DETERMINED, AND - AND WE'LL HAVE THE

15   MOTION THIS WEEK.

16          A    MR. SPRAGG:  YES.

17          Q    OKAY.  THAT -

18          MR. DAVIS:  AND, FINALLY, BECAUSE I KNOW THAT MY TIME

19   - I'M GOING TO HAVE A TRAP DOOR GO OUT FROM UNDER ME ANY

20   MINUTE.

21          MS. GREEN:  YES, YOU ARE.

22   BY MR. DAVIS:

23          Q    AND DO YOU ANTICIPATE ANY WARRANTY EXPOSURE WITH

24   RESPECT TO THE GASOLINE-ELECTRIC HYBRID PROPULSION SYSTEMS?

25          MR. WINTHROP:  AGAIN, THAT'S A HYPOTHETICAL QUESTION.

1       MR. DAVIS:  NO, NO.  IT'S NOT.  I SAID, "DO YOU
2  ANTICIPATE?"

3       MR. WINTHROP:  "ANTICIPATE."  WELL, IT'S A GUESS.

4       MR. DAVIS:  NO, IT'S A - IT'S - HOPEFULLY, THESE
5  PEOPLE ARE RUNNING THE COMPANY -

6       MR. SPRAGG:  YES.

7       MR. DAVIS:  - AND HAVE HAD COMMUNICATIONS - OH, THE
8  ANSWER IS "YES."  THANK YOU VERY MUCH.  IT WASN'T HYPOTHETICAL.
9  BY MR. DAVIS:

10      Q    AND WHO DO YOU EXPECT THOSE CLAIMS FROM?

11      A    MR. SANDER:  NEW FLYER.

12      Q    ANYBODY ELSE?

13      A    MR. SANDER:  POSSIBLY EL DORADO (PHONETIC).

14      Q    ANYBODY ELSE?

15      A    MR. SANDER:  THAT SHOULD BE IT.

16      Q    OKAY.  THANK YOU.

17      MS. GREEN:  OKAY.  ANY OTHER CREDITORS WITH
18  QUESTIONS?

19      DO YOU WANT TO COME UP, SIR?

20      ARE YOU - WHO'S - WHO'S HERE FROM THE CREDITORS'
21  COMMITTEE OR COUNSEL?  IS THAT YOU?

22      MR. WINTHROP:  WE MET WITH THE CREDITORS' COMMITTEE,
23  SO THEY -

24      MS. GREEN:  SO NO ONE'S - NO ONE FROM THE CREDITORS'
25  COMMITTEE HAS ANY QUESTIONS?

1            MR. WINTHROP:  WELL, WE –

2            MS. GREEN:  WELL, NO, HERE'S –

3            MR. WINTHROP:  WE SPENT TWO HOURS WITH THE CREDITORS.

4            MS. GREEN:  - WELL, I KNOW, I KNOW.  BUT I – I WANTED

5   TO – LET ME – BEFORE I HAVE YOU HERE, SIR, LET – LET ME JUST –

6   I – I – I ONLY HAVE FIFTEEN MINUTES LEFT.

7            MR. DYE:  WE'RE GOING TO BE VERY SHORT.

8            MS. GREEN:  OKAY.

9            MR. DYE:  VERY SHORT.

10           MS. GREEN:  OKAY.  GO AHEAD.  AND YOUR NAME, SIR?

11           MR. DYE:  MY NAME IS ERIC (PHONETIC) DYE.  THE LAST

12  NAME IS SPELLED D-Y-E.

13           MS. GREEN:  OKAY.

14           MR. DYE:  THE COMPANY NAME IS WHITAKER (PHONETIC)

15  INVESTMENT CORPORATION.

16           MS. GREEN:  OKAY.

17           MR. DYE:  WE'RE THE PROPERTY MANAGERS FOR THE

18  FACILITY THAT I.S.E. LEASES.  WE'D HAVE HAD COUNSEL HERE TODAY,

19  BUT UNFORTUNATELY WE RECEIVED THIS DOCUMENTATION ABOUT – AT

20  LEAST I RECEIVED THIS DOCUMENTATION ABOUT TWO HOURS AGO, SO I –

21  I AM HERE ON – AND I DON'T HAVE COUNSEL HERE, SO I'M GOING TO

22  ACT –

23           MS. GREEN:  OKAY.  THAT'S FINE.

24           MR. DYE:  - WITHOUT COUNSEL.

25  BY MR. DYE:

1          Q    THERE IS A REFERENCE IN SCHEDULE B, PERSONAL

2     PROPERTY, ITEM NUMBER 29, THAT SAYS, UNDER TYPE OF PROPERTY,

3     MACHINERY, FIXTURES, EQUIPMENT, SUPPLIES USED IN BUSINESS.  AND

4     THEN A DESCRIPTION AND LOCATION OF PROPERTY THAT SAYS,

5     "LEASEHOLD IMPROVEMENTS AT FACILITY.  SEE I.S.E. FIXED ASSET

6     DETAIL."  AND YOU GIVE AN AMOUNT OF ABOUT $55,000.  I WISH TO

7     POINT OUT TO COUNSEL IN THE OTHER GROUP THAT PER THE LEASE ANY

8     TENANT IMPROVEMENTS ARE THE PROPERTY OF THE LESSOR, AND I JUST

9     WANT TO MAKE SURE THAT YOU SHOULD DISTINGUISH BETWEEN TRADE

10    FIXTURES AND THINGS LIKE THAT, AS OPPOSED TO TENANT

11    IMPROVEMENTS.  AND SO I – TO MAKE IT PLAIN AND SIMPLE, IF YOU

12    GO IN, INSTALL ELECTRICAL UTILITY LINES, SUB PANELS, AND THINGS

13    LIKE THAT, THAT BECOMES THE PROPERTY OF THE – OF THE – OF THE

14    LANDLORD.

15          UNIDENTIFIED SPEAKER:  UH-HUH.

16          MR. WINTHROP:  OKAY.  DO YOU – DO YOU HAVE A

17    QUESTION?

18    BY MR. DYE:

19          Q    THE QUESTION IS:  ARE YOU TREATING THIS AS A –

20    AS AN ASSET WHICH YOU WOULD REMOVE OR IT'S GOING TO BE SOLD?

21          A    MR. SPRAGG:  WE HAVE NO PLANS TO MOVE AT THE

22    MOMENT.

23          Q    OKAY.  WHAT I'M ASKING THEN, IN THE EVENT

24    SOMETHING UNTOWARD HAPPENS AND – AND YOU GO – SOMETHING

25    CHAPTER 7, BECAUSE, AGAIN, I'M NOT ACTING – I'M NOT A COUNSEL,

1 | AN ATTORNEY.  I'M ASKING ARE YOU –

2 |         A    MR. MORASH:  THERE'S NO PLANS TO REMOVE THEM.

3 |         Q    OKAY.  OKAY.  DESPITE NO PLANS, IS THERE A WAY

4 | THAT I CAN PUT YOU ON NOTICE THAT THAT – THAT MATERIAL IS NOT –

5 |         MR. WINTHROP:  I THINK YOU JUST HAVE.

6 |         MR. DYE:  OKAY.

7 | BY MR. DYE:

8 |         Q    IN ANOTHER DOCUMENT, SCHEDULE F, YOU LIST

9 | POMERADO LEASING NUMBER ONE AND THE PRIORITY – A NON-PRIORITY

10 | CLAIM OF 31,898.  HOW DID YOU COME UP WITH THAT NUMBER?

11 |         MR. WINTHROP:  WELL, SIR, THIS IS NOT THE VENUE –

12 |         MR. DYE:  IT IS NOT?

13 |         MR. WINTHROP:  – FOR ASKING PARTICULAR QUESTIONS

14 | ABOUT YOUR CLAIM.

15 |         MR. DYE:  VERY GOOD.  THEN I'M DONE.

16 |         MR. WINTHROP:  WE CAN TALK TO YOU AFTER THE HEARING,

17 | OR –

18 |         MR. DYE:  OH, NO.  THAT'S NOT A PROBLEM.

19 |         MR. WINTHROP:  – CALL THE OFFICE TOMORROW.

20 |         MR. DYE:  I JUST WANTED TO FIND OUT.

21 |         MS. GREEN:  OKAY.  AND IF YOU DO HAVE A, YOU KNOW,

22 | DISPUTE WITH YOUR CLAIM, YOU'RE – YOU'RE – YOU CAN – IF YOU

23 | THINK YOUR AMOUNT OF YOUR CLAIM IS INCORRECT, YOU CAN FILE A

24 | PROOF OF CLAIM.

25 |         MR. DYE:  IT WAS JUST AN INQUIRY.  I'M GOING –

1          MS. GREEN:  OKAY.  THAT'S FINE.

2          MR. DYE:  CAN I BE HEARD?

3          MS. GREEN: YES, YOU MAY. THIS ISN'T A FORUM FOR

4    INDIVIDUAL CLAIMS.

5          ANYONE ELSE WITH QUESTIONS?  I'D LIKE TO HEAR FROM

6    SOMEONE FROM THE CREDITORS' COMMITTEE IF THEY HAVE ANY

7    QUESTIONS?  ANYONE?

8          UNIDENTIFIED SPEAKER:  MS. GREEN, I THINK AS MR.

9    WINTHROP MENTIONED, WE DID MEET WITH THE DEBTOR PRIOR TO THE

10   MEETING, AND WE ARE CONTINUING DIALOGUE, SO –

11         MS. GREEN:  OKAY.  COULD I –

12         UNIDENTIFIED SPEAKER:  – FOR THE RECORD.

13         MS. GREEN:  – COULD I JUST – HAS THE CREDITORS'

14   COMMITTEE THEN WEIGHED IN ON THE INSIDER COMPENSATION?

15         UNIDENTIFIED SPEAKER:  WE HAVE NOT.  WE'RE ACTUALLY

16   IN THE PROCESS OF REQUESTING INFORMATION.  YOU KNOW, WE

17   COULDN'T READ WHAT WAS ATTACHED TO IT, THAT REPORT.  WE'RE IN

18   THE – WE'RE AT THE BEGINNING OF THE PROCESS.

19         MS. GREEN:  OKAY.  GREAT.

20         MR. WINTHROP:  THAT'S ON THE ULTIMATE, BUT I THINK

21   THEY DID AGREE TO ONE PAY PERIOD WITHOUT PREJUDICE –

22         MS. GREEN:  OKAY.

23         MR. WINTHROP:  – WHILE THEY'RE DOING THEIR INQUIRY.

24         MS. GREEN:  AND YOU STILL NEED SOME ADDITIONAL

25   INFORMATION.

1           UNIDENTIFIED SPEAKER:   CORRECT.

2           MS. GREEN:   OKAY.

3           ANY OTHER CREDITORS WITH QUESTIONS?

4           OKAY.   I'M – I'M TRYING TO SEE IF I NEED TO CONTINUE

5    THIS, JUST BECAUSE WE HAVE PERHAPS SOME DIFFERENT THINGS

6    HAPPENING IN THE COURT ARENA.   I DON'T HAVE – LET ME JUST KIND

7    OF POLL THE CREDITORS.   DO YOU HAVE ANY VALID REASON WHY YOU'D

8    WANT TO CONTINUE THIS MEETING?   DO WE THINK WE CAN HAVE

9    EVERYTHING SETTLED IN THE COURT?   IF YOU – IF YOU DON'T, I'M

10   GOING TO CONCLUDE IT, SO I JUST – SPEAK NOW OR FOREVER HOLD

11   YOUR PEACE, SO TO SPEAK.

12          OKAY.   THIS MEETING IS CONCLUDED.

13          MR. WINTHROP:   THANK YOU.

14                  (MATTER CONCLUDED.)

15                  -- oOo --

16

17

18

19

20

21

22

23

24

25

1  STATE OF CALIFORNIA

2  COUNTY OF SAN DIEGO

3

4          I, DIANE BERGER, OFFICIAL REPORTER, DO HEREBY

5  CERTIFY:

6          THAT THE OFFICE OF THE U.S. TRUSTEE SUPERVISED THE

7  RECORDING OF PROCEEDINGS HELD IN THE FOREGOING CAUSE ON THE

8  14TH DAY OF SEPTEMBER, 2004;

9          THAT THE RECORDING WAS LATER TRANSCRIBED INTO

10 TYPEWRITING UNDER MY DIRECTION;

11         AND THAT THE FOREGOING TRANSCRIPT CONTAINS A CORRECT

12 STATEMENT OF THE PROCEEDINGS.

13         DATED THIS 21ST DAY OF SEPTEMBER, 2010.

14

15                                        S/ DIANE BERGER
                                          DIANE BERGER
16                                        OFFICIAL REPORTER

17

18

19

20

21

22

23

24

25

# EXHIBIT B



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Shirley S. Cho

September 15, 2010

scho@pszjlaw.com
310/772/2364

**VIA E-MAIL**

ISE Corporation
c/o Marc Winthrop, Esq.
Winthrop Couchot Professional Corporation
660 Newport Center Drive, Ste 400
Newport Beach, CA 92660

ISE Limited
Attn: Richard Sander, CEO
12302 Kerran St.
Poway, CA 92064

       Re:    **ISE Corporation ("Debtor")**
                **Chapter 11 Case No. 10-14198**

Dear Marc and Richard:

       As you are aware, our firm has been retained by the Official Committee of Unsecured Creditors (the "Committee") in the above-referenced Chapter 11 case.

       The Committee has reviewed the Statement of Financial Affairs filed by the Debtor on September 8, 2010 [Docket No. 56-2]. On the summary of payments made by the Debtor to insiders, the Debtor discloses that it made three payments totaling $600,000 (the "Payments") to its parent company, ISE Limited ("Parent"), on the date of the filing of the Debtor's bankruptcy petition, or August 10, 2010. Mr. Sander testified at the 341(a) meeting yesterday that he is not aware if and/or when the Debtor's Board of Directors approved these payments. Despite the testimony at the 341(a) meeting that the Payments were on account of a loan from the Parent to the Debtor it is not clear to the Committee whether that statement is supported by the facts or whether the Payments were an illegal equity distribution from the Debtor to the Parent. In that regard, please immediately provide us with the following documents: (i) all

42802-002\DOCS_LA:225071.1



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

September 15, 2010
Page 2

copies of the Debtor's board minutes from this year; (ii) any and all
loan agreements between the Parent and the Debtor evidencing the
$12 million claim and the reference on Schedule F as the Parent
being a creditor of the Debtor; and (iii) a listing of any and all
transfers from the Parent to the Debtor, including the date, amount,
manner of payment (e.g., direct transfer, set-off, credit) and purpose
of each such transfer within the past year.

     Whether characterized as repayment of debt or an equity
distribution, the Payments appear to have been improper and are
recoverable by the Debtor's estate as either a preference or
fraudulent conveyance under sections 547 and/or 548 of the
Bankruptcy Code. There was further testimony at the 341(a)
meeting that the Parent remains in possession of the proceeds of the
Payments. Demand is hereby made for the Parent to immediately
transfer the Payments to the Debtor and provide the Committee with
evidence that repayment has occurred.

     If we do not receive written confirmation that the Payments
have been repaid by the Parent to the Debtor by Monday, September
20, 2010, we intend to file an action on the Debtor's behalf seeking
to recover the Payments for the benefit of the Debtor's estate,
among other things. Please advise immediately whether the Debtor
will stipulate to the Committee having standing to commence such
an action or whether emergency relief will be necessary.

Very truly yours,

*/s/ Shirley S. Cho*

Shirley S. Cho

cc:    Jeffrey N. Pomerantz
       Committee Members
       U.S. Trustee's Office (c/o Mary Testerman Duvoisin)

# EXHIBIT C



**PACHULSKI STANG ZIEHL & JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

Shirley S. Cho

September 20, 2010

scho@pszjlaw.com
310/772/2364

**VIA E-MAIL**

ISE Corporation
c/o Garrick Hollander, Esq.
Winthrop Couchot Professional Corporation
660 Newport Center Drive, Ste 400
Newport Beach, CA 92660

> **Re:**   **ISE Corporation ("Debtor")**
> **Chapter 11 Case No. 10-14198**

Dear Garrick:

In respect of the $600,000 that was paid out by ISE Corporation to ISE Limited on August 10, 2010, the Committee requests that such funds be immediately placed into a client trust account to be held by Winthrop Couchot and that such funds not be spent unless and until ordered by the Bankruptcy Court.

As stated in my letter dated September 15, 2010, we will file an expedited motion for a ruling on the standing motion unless the Debtor consents. I attach for your consideration the form of a stipulation these two points.

Please be advised that we will be filing the application for order shortening time on Wednesday, September 22, 2010 at noon unless obviated by the execution of the attached stipulation.

Very truly yours,

*/s/ Shirley S. Cho*

Shirley S. Cho

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

**NEW YORK**
780 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

42802-002\DOCS_LA:225301.1



September 20, 2010
Page 2


cc:     Jeffrey N. Pomerantz
        Committee Members

1  Jeffrey N. Pomerantz (CA Bar No. 143717)
   Shirley S. Cho (CA Bar No. 192616)
2  PACHULSKI STANG ZIEHL & JONES LLP
   150 California Street, 15th Floor
3  San Francisco, California  94111-4500
   Telephone: 415/263-7000
4  Facsimile:  415/263-7010
   Email:  jpomerantz@pszjlaw.com
5          scho@pszjlaw.com

6  [Proposed] Counsel for the Official Committee of
   Unsecured Creditors

7

                    **UNITED STATES BANKRUPTCY COURT**
8                    **Southern District of California**

9

10  In re:                               Case No.: 10-14198 MM

11  ISE CORPORATION,                     Chapter 11

12                          Debtor       **STIPULATION RE MOTION OF**
                                         **OFFICIAL COMMITTEE OF**
13                                       **UNSECURED CREDITORS FOR**
                                         **AUTHORITY TO PURSUE**
14                                       **LITIGATION REGARDING**
                                         **UPSTREAMED PAYMENTS TO**
15                                       **PARENT ON BEHALF OF DEBTOR;**
                                         **DECLARATION IN SUPPORT**
16                                       **THEREOF [RE: DOCKET NO. 97]**

17                                       Date:      October 21, 2010
                                         Time:      1:00 p.m.
18                                       Dept:      1
                                         Judge:     Margaret M. Mann
19

20        ISE Corporation, a California corporation, the debtor and debtor-in-possession in the above-

21  entitled Chapter 11 case ("Debtor"), and the Official Committee of Creditors Holding Unsecured

22  Claims, appointed in the Debtor's Chapter 11 case (the "Committee"), by and through their

23  respective counsel, and ISE Limited (the "Parent" or "ISE Ltd") hereby enter into this stipulation

    based upon the following premises.

24
                                         **RECITALS**
25

26        1.       On August 10, 2010, the Debtor commenced this bankruptcy case by filing a

27  voluntary petition under Chapter 11 of the United States Bankruptcy Code.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

2.      On September 20, 2010, the Committee filed its Motion of Official Committee of Unsecured Creditors for Authority to Pursue Litigation Regarding Upstreamed Payments to Parent on Behalf of Debtor; Declaration in Support Thereof [Docket No. 97].

## STIPULATION

**NOW, THEREFORE, IT IS HEREBY STIPULATED** as follows:

1.      Upon execution of this Stipulation, ISE Limited shall remit $600,000 to counsel for the Debtor, Winthrop Couchot, which funds shall be held in trust by Winthrop Couchot until the Bankruptcy Court enters an order regarding disposition of such funds.

2.      The Debtor, without admitting any of the facts in the Motion or the proposed complaint, authorizes the Committee to institute the Action attached to the Motion on behalf of the Debtor's estate.

Dated:  September __, 2010

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**


By: _____
      Marc J. Winthrop
      Garrick A. Hollander
      Payam Khodadadi
[Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession

Dated:  September __, 2010

**ISE LIMITED**


By: _____
Name:
Title:

Dated:  September __, 2010

**PACHULSKI STANG ZIEHL & JONES LLP**


By: _____
      Jeffrey N. Pomerantz
      Shirley S. Cho
[Proposed] Counsel for the Official Committee of
Unsecured Creditors

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# EXHIBIT D

## Shirley S. Cho

**From:** Garrick Hollander [ghollander@winthropcouchot.com]
**Sent:** Tuesday, September 21, 2010 10:54 AM
**To:** Shirley S. Cho; Marc Winthrop
**Cc:** Jeff Pomerantz
**Subject:** RE: ISE Letter

I have to say I was pretty shocked to see that you filed the motion notwithstanding our conversations, understanding, and pending efforts to resolve this matter.  That being said, while I need to obtain authority from the ISE Limited board, I believe they will be (or at least would have been prior to you filing the motion for standing to sue them) amenable to a deal that provides wiring the funds to our account and agreeing that if they seek to transfer the funds to anyone other than the debtor, they would not do so without first giving you 10 days' notice of such intended transfer, thereby giving you the opportunity to file whatever pleading you felt necessary under the circumstances.

Garrick A. Hollander, Esq.

## WinthropCouchot
660 Newport Center Drive, Suite 400
Newport Beach, CA  92660
T (949) 720-4100
F (949) 720-4151

**From:** Shirley S. Cho [mailto:scho@pszjlaw.com]
**Sent:** Monday, September 20, 2010 8:04 PM
**To:** Garrick Hollander; Marc Winthrop
**Cc:** Jeff Pomerantz
**Subject:** ISE Letter

Garrick, per our conversation this morning.  Thanks.

# EXHIBIT

# E

**Shirley S. Cho**

| | |
|---|---|
| **From:** | Garrick Hollander [ghollander@winthropcouchot.com] |
| **Sent:** | Thursday, September 23, 2010 5:53 PM |
| **To:** | Shirley S. Cho; Jeff Pomerantz |
| **Cc:** | Marc Winthrop |

**Subject:** Status

Financial position and cash needs:  Please talk to BDO to get an update as they were downloaded today with 2 hours of dialogue from the debtor,
along with financial information

$600k:  I spoke to my client about the issues related to this.  This issue will be discussed at the next ISE Limited board meeting, which is scheduled for Tuesday.  I'll keep you in the loop.

NDA:  I should have comments or approval from client by tomorrow morning.  Notwithstanding, our client has obviously been acting in good faith and providing information as illustrated above.

Garrick A. Hollander, Esq.
**WinthropCouchot**
660 Newport Center Drive, Suite 400
Newport Beach, CA  92660
T (949) 720-4100
F (949) 720-4151

# EXHIBIT

# F

**Shirley S. Cho**

| | |
|---|---|
| **From:** | Garrick Hollander [ghollander@winthropcouchot.com] |
| **Sent:** | Thursday, September 23, 2010 3:19 PM |
| **To:** | Jeff Pomerantz; Shirley S. Cho; Marc Winthrop |
| **Cc:** | William K. Creelman |
| **Subject:** | RE: ISE Letter |

There's no debate - so does that mean you won't answer my question?

Garrick A. Hollander, Esq.

# WinthropCouchot

660 Newport Center Drive, Suite 400
Newport Beach, CA  92660
T (949) 720-4100
F (949) 720-4151

**From:** Jeff Pomerantz [mailto:jpomerantz@pszjlaw.com]
**Sent:** Thursday, September 23, 2010 3:17 PM
**To:** Garrick Hollander; Shirley S. Cho; Marc Winthrop
**Cc:** bcreelman@bdo.com
**Subject:** Re: ISE Letter

I am done debating you.

Let me know if you will sign the stip giving the committee standing.

Let me know who is representing ise ltd
Jeff Pomerantz
--------------------------
Sent from my Blackberry

Pachulski Stang Ziehl & Jones, LLP
Los Angeles | San Francisco | Wilmington, DE | New York

**From:** Garrick Hollander [mailto:ghollander@winthropcouchot.com]
**Sent:** Thursday, September 23, 2010 03:12 PM
**To:** Jeff Pomerantz; Shirley S. Cho; Marc Winthrop
**Cc:** William K. Creelman
**Subject:** RE: ISE Letter

Unfortunately, you still have not answered my question.  I don't understand why you keep talking about the past and threatening us and the debtor in the present.  I'm trying to help you work with me in deriving a practical solution to solve the concern you say the committee believes exists.

By the way, while irrelevant to my original question, your point about ISE Limited needing a separate lawyer is a perfect example of why I can't advise ISE Limited to do anything.

Garrick A. Hollander, Esq.
WinthropCouchot
660 Newport Center Drive, Suite 400

Newport Beach, CA 92660
T (949) 720-4100
F (949) 720-4151
**From:** Jeff Pomerantz [mailto:jpomerantz@pszjlaw.com]
**Sent:** Thursday, September 23, 2010 10:21 AM
**To:** Garrick Hollander; Shirley S. Cho; Marc Winthrop
**Cc:** William K. Creelman; Jeff Pomerantz
**Subject:** RE: ISE Letter

My point exactly. Money is everything and it is outrageous that a cash strapped company would
upstream $600,000 to its parent on the day of filing. If the Committee had not pushed this issue the
Debtor would not have done anything to address it. ISE Ltd either agrees to segregate the money as we
request and the Debtor agrees to allow the Committee to prosecute the claims or we will have litigation.
And it will not be pretty for the Debtor or ISE. Sure ISE can defend the action and delay and the money
will not be upstreamed right away. That would be unfortunate and compound the problem and likely
add a consequential damage component to what appears to the Committee to be an intentional fraudulent
conveyance.


Jeff
---------------------------------------------------------------------------------------------------------------
**From:** Garrick Hollander [mailto:ghollander@winthropcouchot.com]
**Sent:** Thursday, September 23, 2010 10:05 AM
**To:** Jeff Pomerantz; Shirley S. Cho; Marc Winthrop
**Cc:** William K. Creelman
**Subject:** RE: ISE Letter
Your demand is simple, but that's not what I was asking about. Perhaps in typical cases that you are
involved, money is no object -- but in the middle market that we serve, practicality is everything. I'm
trying to understand, as a practical matter, what your efforts will entail and how that will accomplish the
goal of what you say you're trying to accomplish. I'm not sure I see the path that you see. This case
will not be successful if made litigious -- everyone needs to be practical and work together.

Thanks.

Garrick A. Hollander, Esq.
WinthropCouchot
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
T (949) 720-4100
F (949) 720-4151
**From:** Jeff Pomerantz [mailto:jpomerantz@pszjlaw.com]
**Sent:** Thursday, September 23, 2010 9:56 AM
**To:** Garrick Hollander; Shirley S. Cho; Marc Winthrop
**Cc:** Jeff Pomerantz; Bill Creelman
**Subject:** RE: ISE Letter

Its simple Garrick. The proposal is (a) that the money is in your trust account and doesnt get used
without Committee consent or Court order; and (b) that the Committee has standing to prosecute the
action immediately.

Please let us know who is representing ISE Ltd regarding the first aspect of the proposal as your firm

obviously cannot represent them given the conflict.

Please let us know whether the Debtor will agree to the second aspect of the proposal.

The Committee intends to vigorously prosecute the avoidance action and reserves all rights against the Debtors' officers and directors for their role in upstreaming the money to ISE Ltd.

How long the action will take to prosecute is irrelevant -- it needs to be prosecuted and now.

We look forward to hearing from you.

Jeff

---

**From:** Garrick Hollander [mailto:ghollander@winthropcouchot.com]
**Sent:** Thursday, September 23, 2010 9:49 AM
**To:** Shirley S. Cho; Marc Winthrop
**Cc:** Jeff Pomerantz
**Subject:** RE: ISE Letter

Apparently not – anyway, let's move on from that.  I have sent two proposals at your request – based on this current e-mail, I presume the committee has seen both of my e-mails and has rejected?  If that's the case, I will pass this along to my client, to see if their minds have changed, but I suspect it will not.

That being said, assuming they say no, would you mind walking me down the path of how you will recover the $600k into the estate in 1-2 weeks – (from a legal and practical perspective – both in steps and timing, and assuming two scenarios – one where parent files bankruptcy and one where parent doesn't)?  As an example, Step 1, x will be filed, Step 2, y, step 3 etc.   That will be very helpful.

Thanks.

Garrick A. Hollander, Esq.
WinthropCouchot
660 Newport Center Drive, Suite 400
Newport Beach, CA  92660
T (949) 720-4100
F (949) 720-4151
**From:** Shirley S. Cho [mailto:scho@pszjlaw.com]
**Sent:** Wednesday, September 22, 2010 8:37 PM
**To:** Garrick Hollander; Marc Winthrop
**Cc:** Jeff Pomerantz
**Subject:** RE: ISE Letter

Garrick, I apologize if you were shocked.  I was clear in all of my conversations with you that unless the funds were returned, we'd be going in on the standing motion.

As discussed today at the status conference, if we cannot agree on the form of the stipulation to escrow the funds, the Court will entertain an OST.  Marc represented at the hearing that you had offered to escrow the funds.  The only communication I have had from you in response to my letter of Monday is the below email wherein you state that you need authority from the ISE Ltd board, and even if you get authority, you only offered to move the funds into an escrow account, but would allow the funds to be spent upon 10 days' notice.  The Committee's position is that the funds must be transferred into the client

trust account and once transferred there, cannot be moved until there is a Court order.

Would you please also let us know if the Debtor will consent to the Committee having standing to obviate the need for the motion? Thank you.

---

**From:** Garrick Hollander [mailto:ghollander@winthropcouchot.com]
**Sent:** Tuesday, September 21, 2010 10:54 AM
**To:** Shirley S. Cho; Marc Winthrop
**Cc:** Jeff Pomerantz
**Subject:** RE: ISE Letter

I have to say I was pretty shocked to see that you filed the motion notwithstanding our conversations, understanding, and pending efforts to resolve this matter. That being said, while I need to obtain authority from the ISE Limited board, I believe they will be (or at least would have been prior to you filing the mo tion for standing to sue them) amenable to a deal that provides wiring the funds to our account and agreeing that if they seek to transfer the funds to anyone other than the debtor, they would not do so without first giving you 10 days' notice of such intended transfer, thereby giving you the opportunity to file whatever pleading you felt necessary under the circumstances.

Garrick A. Hollander, Esq.
WinthropCouchot
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
T (949) 720-4100
F (949) 720-4151
**From:** Shirley S. Cho [mailto:scho@pszjlaw.com]
**Sent:** Monday, September 20, 2010 8:04 PM
**To:** Garrick Hollander; Marc Winthrop
**Cc:** Jeff Pomerantz
**Subject:** ISE Letter

Garrick, per our conversation this morning. Thanks.

# EXHIBIT

# G



Innovative Solutions for Energy

Print Page  Close Window

## ISE DELAYS FILING OF INTERIM FINANCIAL STATEMENTS

SAN DIEGO, CALIFORNIA, Aug 13, 2010 (Marketwire via COMTEX) --

ISE Limited ("ISE" or the "Company") (TSX:ISE) announced today that it will not be able to meet the filing deadline of August 16, 2010 for the filing of its second quarter interim financial statements, CEO and CFO certifications and management's discussion and analysis (collectively the "Required Documents") for the six-month period ending June 30, 2010. The Company cannot confirm when it will be in a position to file the Required Documents.

The delay is a result of the Company's financial position. As announced in its press release of August 10th, the Company's principal operating subsidiary, ISE Corporation, has filed a voluntary petition to reorganize its business under Chapter 11 of the United States Bankruptcy Code. The Company does not currently have the available resources or capacity to have its auditors conduct a review engagement of the interim statements or to prepare management-prepared interim statements, nor does it believe that management-prepared statements would be appropriate in the circumstances.

Due to the failure to file the Required Documents, the applicable Canadian Securities Regulators may, in their discretion, determine that it would be appropriate to issue a general issuer cease trade order affecting all of the Company's securities.

About ISE Limited

ISE Limited (www.isecorp.com) is a leading developer, manufacturer and distributor of Energy Storage Systems (ES Systems) and Heavy Duty Hybrid-Electric Drive Systems (Hybrid Systems). ISE products are developed based on our core proprietary technology, which focuses on three critical subsystems: energy storage, controls software, and power electronics. ISE specializes in series hybrid-electric and all-electric/zero emission technologies, and offers industry-leading ES Systems and Hybrid System components. Over the past 10 years, ISE has sold over 300 Hybrid Systems that have demonstrated reliability and performance in over 13 million miles of fleet operation.

Established in 1995, ISE is headquartered in San Diego, California. ISE's history of innovation and technological leadership has resulted in the design and development of systems and components that deliver superior operating performance. For more information visit www.isecorp.com.

Caution Regarding Forward-Looking Statements

This press release contains forward-looking statements. All statements other than statements of historical fact contained in this press release are forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "project," "anticipates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other comparable terminology. These statements are only current predictions and are subject to known and unknown risks, uncertainties and other factors that may cause our or our industry's actual results, levels of activity, performance or achievements to be materially different from those anticipated by the forward-looking statements. Some of these factors are described in greater detail in the "Risk Factors" section of ISE's Prospectus dated February 11, 2010 filed on SEDAR, ISE's Annual Information Form for the year ended December 31, 2009 filed on SEDAR, and ISE's other filings with the Canadian

securities regulatory authorities. These risks and uncertainties include, among others, risks associated with ISE's long and unpredictable sales cycle; risks associated with product liability and warranty claims and the safety of ISE's products; risks relating to ISE's need for additional capital; risks associated with variations in the size, type and timing of customer orders for ISE's products; risks associated with market acceptance and reliability of ISE's products; risks associated with entering into long-term contracts and contracts with governmental agencies; risks associated with the availability, level and terms of government subsidies and incentives; risks associated with customer concentration and ISE's dependence on a small number of suppliers and original equipment manufacturers ("OEMs"); risks associated with ISE's strategic relationships; risks associated with executing ISE's growth strategy in the United States and internationally and scaling up our manufacturing capacity; risks relating to the retention and recruitment of qualified personnel; risks resulting from competition with larger businesses with greater resources; risks associated with technological advancements in ISE's industry; and risks relating to the protection of ISE's intellectual property.

Although ISE believes that the expectations reflected in the forward-looking statements are reasonable, ISE cannot guarantee future results, levels of activity, performance or achievements. Except as required by law, ISE does not intend to update or revise any of the forward-looking statements, whether as a result of new information, future events or otherwise, after the date of this press release.

ISE, the ISE logo and Ultra-E are trademarks of ISE Limited. Other brand or product names are trademarks of their respective holders. Copyright (C) 2010 ISE Limited. All rights reserved.

SOURCE: ISE Limited

ISE Company IR Contact:
ISE Limited
David Morash
Chief Financial Officer
+1 858-413-1720 x655
ISE Media Contact:
ISE Limited
Alex Bernasconi
Senior Vice President, Sales & Marketing
+1 858-413-1720 x775